UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL VICTOR,

        Plaintiff,          Case No. 1:20-cv-13218

v.          Honorable Thomas L. Ludington
        United States District Judge

KIMBERLY REYNOLDS, and ADVANCED
CORRECTIONAL HEALTHCARE, INC.,

        Honorable Patricia T. Morris
        Defendants.          United States Magistrate Judge
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S OBJECTIONS TO REPORT AND RECCOMENDATION, ADOPTING REPORT AND RECCOMENDATION, AND DENYING PLAINTIFF'S MOTION FOR DEFAULT**

In April 2019, Plaintiff Michael Victor suffered a grand mal seizure minutes after being released from Otsego County Jail (OCJ) and after he alleges OCJ officials denied him his anti-seizure medication, upon the direction of Advanced Correctional Healthcare, Inc. (ACH) practitioners. For the past two years, the Parties have been deadlocked in a discovery dispute. At its core, the dispute concerns access to information—namely any records or documentation which may show who, if anyone, from ACH received a call from OCJ on April 28, 2019 concerning Plaintiff's medication. On one hand, Plaintiff has little evidence aside from his own testimony that any ACH healthcare practitioner was ever called. On the other hand, after Plaintiff stipulated to Otsego County's dismissal, ACH is the only party who would have access to such evidence. Accordingly, this Court has directed Defendants to produce discovery responsive to Plaintiff's claims that ACH was contacted and has sanctioned Defendants for their unforthcoming disclosures in the form of provisional adverse inferences.

The most recent installment of this discovery dispute takes the form of Plaintiff's *second* Motion for Default Judgment. In October 2023, Magistrate Judge Patricia T. Morris recommended this Court deny Plaintiff's second Motion for Default Judgment because she concluded Defendants did not violate this Court's discovery orders by failing to produce payroll timesheets for ACH medical practitioners whom Defendants identified as on call to service OCJ throughout the six-month period surrounding April 28, 2019.

Plaintiff filed one Objection to Judge Morris's Report and Recommendation. But the Objection does not identify a flaw in Judge Morris's conclusion and, to the extent Plaintiff does identify a flaw, he has not identified clear error. Accordingly, Plaintiff's Objection will be overruled, Judge Morris's Report and Recommendation will be adopted, and Plaintiff's second Motion for Default Judgement will be denied. However, Plaintiff has shown that Defendants can produce the at-issue payroll timesheets, which may confirm whether any identified practitioner serviced OCJ on the morning of April 28. Thus, Defendants will be directed to produce the timesheets of all primary and backup practitioners they recently identified. And if these time sheets further corroborate Defendants' claims that no ACH practitioner received a call from OCJ nor worked at OCJ on April 28, 2019, this Court will rescind the prior provisional inference to the contrary.

## I.

### A. Factual Background

Just after midnight on April 28, 2019, Plaintiff Michael Victor was arrested by Gaylord Police Department (GPD) Officer Blake Huff for disorderly conduct and resisting while Plaintiff was intoxicated. ECF No. 38 at PageID.432. Officer Huff brought Plaintiff to the Otsego County Jail (OCJ) and contacted Plaintiff's family. *Id.* Around 1:00 AM on April 28, 2019, Plaintiff's

mother arrived at OCJ to deliver Plaintiff's Keppra—an anti-seizure medication Plaintiff took twice daily to treat his epilepsy. *Id.*; ECF Nos. 70 at PageID.1421; 45-5 at PageID.541; 45-11 at PageID.598, 601, 609; 70 at PageID.1421–22. Plaintiff's mother gave the Keppra to Officer Huff and stressed that, without his medication, Plaintiff "would have a seizure" because he had severe epilepsy and his last dose of medication was taken almost eleven hours earlier.[1] ECF Nos. 38 at PageID.433; 45-11 at PageID.606. Officer Huff gave the medication—and conveyed its importance—to either Trey Leach or Tony Tallent, the only two Otsego County Correctional Officers working at OCJ at the time. *Id.*; *see also* ECF No. 45-5 at PageID.541–42. And around 4:00AM, Officers Leach and Tallent were relieved by Officer Scott Musall and Officer Joe Sullivan. *See* ECF No. 49-6 at PageID.805.

But the medication never made it to Plaintiff. ECF No. 38 at PageID.433. And, minutes after Plaintiff was released from OCJ around 11:30 AM on April 28, 2019, "Plaintiff suffered a grand mal seizure,"[2] fell face-first onto the cement, and broke his jaw. *Id.* at PageID.435–36. The Parties dispute much of what happened while Plaintiff was confined at OCJ before his seizure.

Plaintiff alleges that OCJ personnel told him his mother dropped off his medication and that they "were going to contact the nurse to see if [he] could take it." ECF No. 45-11 at PageID.610. Plaintiff further testified that he asked for his medication multiple times, but Officer Sullivan eventually told him that the "nurse did not okay it" because Plaintiff "had alcohol in [his]

---

[1] Indeed, Plaintiff avers he suffered seizures while he was previously confined at OCJ and did not have access to his Keppra. ECF No. 45-11 at PageID.596–97.

[2] A grand mal, or "tonic-clonic," seizure is common among those diagnosed with epilepsy and "causes a loss of consciousness and violent muscle contractions." *Tonic-Clonic (Grand Mal) Seizure*, MAYO CLINIC (Dec. 12, 2023), https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-causes/syc-20363458 [https://perma.cc/EFB5-L2PZ]. This type of seizure has two stages. The first "tonic" phase involves a loss of consciousness and lasts for 10-20 seconds. The second "clonic" phase involves convulsions and usually lasts one or two minutes. *Id.*

system." *Id.* at PageID.611. Plaintiff also testified that OCJ officers taunted him with his medication by "shaking it at [him] telling [him] they ha[d] his meds, but [he] [couldn't] have them." *Id.* at PageID.617.

Importantly, OCJ does not have its own nurses or medical staff. Instead, it—like many other correctional facilities throughout the country—contracts with Advanced Correctional Healthcare, Inc. (ACH) for inmate healthcare.[3] ACH provides each jail it services with a mid-level practitioner who can prescribe medication and is on call 24/7, 365 days per year. ECF No. 69-2 at PageID.1376, 1381; *see also* ECF No. 45-2 at PageID.511. And if the mid-level on-call practitioner cannot be reached, ACH typically provides at least two backup practitioners for the jail to contact. ECF No. 69-2 at PageID.1382–84.

Plaintiff alleged in his Complaint that Nurse Kimberly Reynolds was the ACH practitioner responsible for denying his medication. *See generally* ECF No.38. Officer Leach testified that, although he cannot remember *whether* she was called, Nurse Reynolds would have been the ACH practitioner called on April 28, 2019. ECF No. 45-7 at PageID.564. Indeed, Defendants' initial answers to Plaintiff's first interrogatories confirmed "ACH Nurse Kimberly Reynolds was on call during the time Plaintiff was in [OCJ] on April 28, 2019." ECF No. 45-8.

But Defendants quickly claimed this answer was incorrect. Nurse Reynolds submitted an affidavit of non-involvement, ECF No. 45-3; testified under oath that she was not on call and did not know Plaintiff, ECF No. 45-5 at PageID.529; and submitted payroll timesheets which confirmed she did not log work hours for payment on April 28, 2019, ECF No. 45-3 at PageID.523.

---

[3] ACH advertises as "the nation's largest jail contract management company" with contracts with over 370 correctional institutions across 22 states, servicing over 34,000 incarcerated individuals daily. *About*, ADVANCED CORRECTIONAL HEALTHCARE, INC., https://www.advancedch.com/about https://www.advancedch.com/about (last visited Jan. 14, 2024) [https://perma.cc/9UBB-X7CN].

Defendants have since identified nurse practitioner Courtney Brinkman as the primary ACH on-call practitioner scheduled to serve OCJ on April 28, 2019, ECF Nos. 70 at PageID.1421; 70-2 at PageID.1444, 1450–51. But Defendants produced Nurse Brinkman's phone records which confirm that she did not receive any calls from OCJ that day, ECF No. 70 at PageID.1425–26, and produced her payroll timesheet which confirms she never submitted a request for payment of any services rendered that morning. ECF No. 74-7. What happened at OCJ while Plaintiff was confined on April 28, 2019 remains unclear.

### B. Procedural Posture and Discovery Disputes

On December 8, 2020, Plaintiff filed a Complaint alleging Eighth Amendment deprivations against (1) Otsego County, (2) Officer Huff, (3) the City of Gaylord, (4) ACH, and (5) Nurse Reynolds, seeking to hold each Defendant jointly and severally liable.[4] ECF No. 38. On December 2, 2021—nearly one year after the Complaint was filed—Plaintiff stipulated to the dismissal of Officer Huff and the City of Gaylord without prejudice. ECF No. 29. And on January 19, 2022, Plaintiff stipulated to the dismissal of Otsego County with prejudice.[5] ECF No. 36. Notably, Counsel for the only remaining Defendants—ACH and Nurse Reynolds—did not sign either stipulated dismissal. *See* ECF Nos. 29; 36.

---

[4] Notably, the contract between ACH and Otsego County included parallel indemnification provisions, in which ACH agreed to "hold harmless and indemnify the COUNTY and SHERIFF (together with their respective employees) against any loss or damage . . . solely caused or necessitated by the negligent, reckless, intentional, or deliberately indifferent conduct of ACH or its employees, which is related to medical care provided by ACH" and Otsego County agreed to hold harmless and indemnify ACH (together with its respective employees) against any loss or damage . . . solely caused or necessitated by the negligent, reckless, intentional, or deliberately indifferent conduct of the COUNTY or its employees, which is related to medical care provided by ACH." ECF No. 45-2 at PageID.516 (emphasis in original).
[5] The heading of Plaintiff's Amended Complaint, filed after Otsego County's stipulated dismissal, incorrectly lists Otsego County as a party. *See* ECF No. 38 at PageID.429. Plaintiff has since corrected his pleading headings. *See, e.g.* ECF Nos. 48 at PageID.655; 54 at PageID.842.

The discovery disputes began in 2022, shortly after Otsego County was dismissed. On February 25, 2022, Defendants filed a motion for summary judgment. ECF No. 45. Plaintiff responded that Defendants' motion should be denied for incomplete discovery and filed a Civil Rule 56(d) Motion, ECF No. 47, along with a motion to compel discovery, ECF No. 54. Both discovery motions were referred to Magistrate Judge Patricia T. Morris. ECF No. 57. On June 14, 2022, Judge Morris granted Plaintiff's motion to compel, which sought the to depose an ACH representative who could provide:

(1) ACH's Policies, procedures, and practices for healthcare providers (including an on-call provider) being staffed to provide medical care, including providing medication, at OCJ from January 1, 2019 to January 1, 2021. ECF No. 54-3 at PageID.882.
(2) **ACH's staffing information (including the identities and days worked) for on-call providers scheduled to be on call and who was on call at OCJ from January 1, 2019 to January 1, 2021.** *Id.*
(3) ACH's supervisory policies, procedures and practices for any medical providers (either on-call provider or other healthcare providers) who provided medical care at OCJ from January 1, 2019 to January 1, 2021. *Id.*
(4) **All instances of complaints of either ACH providing inadequate medical care or having inadequate staffing for a prison where ACH was contracted by a prison facility in the Midwest region since 2017.** *Id.* at PageID.883
(5) Instances where an on-call ACH provider was contacted after hours by OCJ personnel regarding medical care from January 1, 2018 to January 2, 2021, including the names of both the ACH and OCJ employees involved. *Id.*
(6) **ACH's complete staffing schedule for OCJ from January 1, 2019 to January 1, 2021, including the identities of all ACH employees who worked during this time.** *Id.*
(7) Policies, procedures and practices for OCJ personnel to contact ACH regarding medical care (including providing medication) needed at the facility. *Id.*
(8) Training for ACH medical personnel regarding their duties and work schedules as it pertains to medical care provided at OCJ. *Id.*

Additionally, Judge Morris granted Plaintiff's Rule 56(d) motion and ordered Defendant to produce:

(1) A representative from ACH who provided active management of the contract between OCJ and ACH at the time of the April 28, 2019, for Plaintiff to depose.
(2) Either (A) phone records of all persons who were working or on call from the time Plaintiff was booked until he was released on April 28, 2019, or (B) authorization and any information necessary to provide Plaintiff the ability to access those records form any phone provider.

> (3) The staffing schedules and any confirming documentation that staff listed on the schedule "*actually worked*" at the time indicated on the schedule, from the time Plaintiff was booked until he was released on April 28, 2019.

ECF No. 64 at PageID.1321–22 (the "June 2022 Discovery Order). This Court accordingly denied Defendants' motion for summary judgement and extended discovery. ECF No. 67.

On July 5, 2022, Plaintiff deposed Dr. Jill Bresnahan—ACH's selected representative and Vice President of Medical Operations. *See* ECF No. 69-2. But Dr. Bresnahan did not "provide active management of the contract" between OCJ and ACH on April 28, 2019 because she was not employed with ACH at the time. *See id.* at PageID.1367, 1398; *see also* ECF No. 83 at PageID.2006. As Defendants explained, Dr. Bresnahan *currently* oversees ACH's contract with OCJ and her predecessor, who managed the contract in April 2019, no longer works for ACH. ECF No. 107 at PageID.2554. Dr. Bresnahan testified that ACH does not have many of the policies or procedures sought by Plaintiff and did not produce any documents responsive to the categories outlined in Plaintiff's subpoena.[6] *See* ECF No. 69-2 at PageID.1354–66. Instead, Dr. Bresnahan explained that the *jails set their own policies* for staffing and contacting ACH practitioners. *Id.* at PageID.1354, 1364, 1370. Indeed, Dr. Bresnahan testified that each ACH practitioner sets their

---

[6] Specifically, Dr Bresnahan (1) testified ACH does not have policies or procedures for its healthcare providers, ECF No. 69–2 at PageID.1354; (2) did not produce any staffing information from 2019 to 2021, aside from confirming that Nurse Brinkman was on call on April 28, 2019, *id.* at PageID.1355; (4) testified ACH does not have supervisory policies, procedures, or practices for any practitioners who were on call at OCJ from 2019 to 2021, *id.* at PageID.1355–56; (5) did not produce any complaints against ACH for inadequate staffing or medical care, claiming she did not have access to this information, *id.* at PageID.1356–57; (6) did not produce any information concerning an on-call ACH practitioner being contacted after hours by OCJ from 2019 to 2021, *id.* at PageID.1362–63; (7) did not produce an ACH staffing schedule for OCJ from 2019 to 2021, *id.* at PageID.1363; (8) testified ACH does not have policies or procedures for OCJ personnel to contact ACH for medical care, because each institution sets their own policies, and although ACH provides templates or model contact procedures, Dr. Bresnahan did not produce any templates, *id.* at PageID.1364–65; and (8) did not produce any documents reflecting training ACH practitioners receive regarding their duties and schedules pertaining to medical care at OCJ. *Id.* at 1365–66.

schedule by working with the serviced jail—not ACH. *Id.* at PageID.1370, 1376. 1379. Thus, Dr. Bresnahan testified, ACH does not *proactively* create or maintain "schedules" for its practitioners; it instead only *reactively* knows when a practitioner worked for a serviced jail *only if* a practitioner logs their worked time into ACH's online payroll system, Paycom. *Id.* at PageID1377.

Dr. Bresnahan also identified Nurse Practitioner Courtney Brinkman as the ACH primary on-call practitioner for OCJ on April 28, 2019. *See id.* at PageID.1380. On July 13, 2022, Defendants explained that Nurse Brinkman no longer worked for ACH but provided Plaintiff with her cell phone number and signed, notarized authorization to allow Plaintiff to obtain her phone records. ECF No. 107 at PageID.2554. And on August 9, 2022, Defendant supplemented its production to further include Nurse Brinkman's subpoenaed phone records which confirmed she neither called OCJ nor received a call from OCJ on April 28, 2019. *Id.* at PageID.2555–56; *see also* 107-7 at PageID.2621–28. And, before producing her phone records, Defendants produced Nurse Brinkman's timesheets, which further reflected that she did not service OCJ on April 28, 2019. *See* ECF Nos. 107 at PageID.2555; 107-6 at PageID.2615.

### C. Plaintiff's First Motion for Default Judgment and Subsequent Discovery

On October 5, 2022, Plaintiff filed his first motion for default judgment, arguing Defendants violated the June 2022 Discovery Order by (1) selecting Dr. Bresnahan as a deponent because she was unfamiliar with the case and was not forthcoming with the subpoenaed documentation; (2) failing to adequately produce phone records or information necessary for Plaintiff to access those records for ACH practitioners; and (3) failing to adequately produce staffing information. ECF No. 69. That same month, Defendants filed a motion to sanction Plaintiff for pursuing "frivolous and unsupported claims" because, in their view, discovery confirmed that

OCJ personnel did *not* call *any* ACH practitioner—including Defendant Nurse Reynolds—on April 28, 2019. ECF No. 77.

Both Plaintiff's first motion for default judgment and Defendants' motion for sanctions were referred to Judge Morris. ECF Nos. 71; 81. On December 13, 2022, Judge Morris issued a report (R&R) recommending this Court deny both motions. ECF No. 83. As to Plaintiff's first Motion for Default Judgment, Judge Morris found two "true violations" of the June 2022 Discovery Order:

> (1) Defendant's "failure to provide documented 'instances of complaints' regarding 'inadequate medical care,'" *id.* at PageID.2022; and
> (2) Defendant's "failure to provide the scheduling information *and* the phone records of backup practitioners[.]" *Id.* (emphasis added)

But Judge Morris concluded that a default judgment was unwarranted and, instead, recommended this Court extend discovery further "to allow [Defendants] to more fully comply" with the June 2022 Discovery Order and "warn them that further deficiencies may lead to harsher sanctions, including default judgment." *Id.* at PageID.2025.

On January 5, 2023, this Court overruled Plaintiff's objections, adopted the R&R,[7] denied Plaintiff's first motion for default judgement, and denied Defendants' motions for sanctions and summary judgment. ECF No. 86 (the "January 2023 Discovery Order"). This Court directed Defendants to cure the two "true" discovery violations on or before January 30, 2023, and, importantly, further sanctioned Defendants for these violations by directing them to take following facts as "provisionally" established:

---

[7] Notably, Judge Morris also concluded that Plaintiff's first motion for default judgment was untimely because Plaintiff "sat on the[] issues for well over a month" before the discovery cutoff and "waited another [23] days before bringing the[] issues to the Court's attention." ECF No. 83 at PageID.2010. But this Court held this finding was contrary to law, and adopted Judge Morris' R&R to the extent it denied Plaintiff's first motion for default judgment on the merits. ECF No. 86 at PageID.2058–59.

> (1) ACH has had *some* instances of complaints that it either provided inadequate medical care or had inadequate staffing for a prison facility in the Midwest region since 2017[;] [and]
> (2) One of the corrections officers supervising Plaintiff's detention *called one of ACH's employees* to seek permission to administer Plaintiff's medication.

*Id.* at PageID.2063, 2065 (emphasis added). As this Court explained, these facts were only *provisionally* established "until conclusive evidence proved otherwise," ECF No. 101 at PageID.2497, and "because further discovery might narrow or clarify the details." ECF No. 86 at PageID.2062, n. 2. In addition to these provisional inferences, this Court warned Defendants that their next discovery violation "*will* result in sanctions, including default judgment, contempt, or both." *Id.* at PageID.2065 (emphasis in original).

In efforts to timely cure their first discovery violation—failing to provide complaints of inadequate staffing or medical care—Defendants explained that "ACH does not keep a repository of civil complaints filed against" it but, nevertheless, Defendants requested a "Loss Run Report" from ACH's third party claims administrator, was in the process of redacting the Report, and assured that production was forthcoming. ECF No. 107 at pageID.2558. Less than two weeks later, Defendants provided the redacted Loss Run Report which contained the documented instances of complaints regarding inadequate medical care or staffing within the Midwest. *Id.* at PageID.2561.

In efforts to timely cure their second discovery violation—failing to produce scheduling and phone record information for primary and backup on-call practitioners—Defendants produced a "Staffing Matrix" prepared by ACH's IT department which listed nine medical professionals, including four primary and backup ACH practitioners—who serviced OCJ from February 4, 2019– July 17, 2019.[8] ECF No. 87-4 at PageID.2106. Notably, the Matrix identified Nurse Brinkman as

---

[8] The identified primary and backup on-call practitioners were Courtney Brinkman, Jill Nocerini, Joseph Mashni, and Wilma Kagarise. ECF No. 87-4 at PageID.2106. The identified Regional

- 10 -

the primary on-call practitioner from February 4, 2019 through June 28, 2019 and Nurse Jill Nocerini as the backup practitioner for this period. *See id.* Having already produced Nurse Brinkman's phone records, Defendant explained that Nurse Nocerini no longer works for ACH but provided her last known postal address, email address, and cell phone number. *Id.*

Accordingly, on January 30, 2023, Defendants' deadline to cure their discovery violations, Defendants filed notice of their compliance with this Court's discovery orders which detailed their production and expressed their view that all discovery violations were cured. ECF No. 91.

### D. Plaintiff's Second Motion for Default Judgment

In Plaintiff's view, Defendants' production was still inadequate. On July 27, 2023, nearly six months after Defendants' filed their notice of compliance, Plaintiff filed a second Motion for Default Judgment arguing Defendants were still in violation of this Court's discovery orders because (1) the Staffing Matrix did not identify which practitioners were on call each day within the relevant six-month period and Defendants provided no other confirming scheduling documentation such as timesheets for these practitioners; and (2) Defendants did not produce Nurse Nocerini's phone records. ECF No. 104.

Defendants responded that Plaintiff's second Motion for Default Judgement largely repeated the same arguments Plaintiff made—and this Court rejected—in his first motion for default judgment. ECF No. 107 at PageID2563–66 (arguing Dr. Bresnahan's deposition was violative). Defendants further argued the Staffing Matrix complied with this Court's discovery orders because it identified the two on-call practitioners on April 28, 2019—Nurse Brinkman and Nurse Nocerini. *See id.* at PageID.2566–68. Defendants argued they did not need to specify the

---

Medical Director was Travis Schamber and the identified regional nurse managers were Bonnie Putz, Laurina Boryca, Sandi Lehman, and Amanda Miller. *Id.*

- 11 -

"times" these practitioners worked because the nurses were "on call" and thus inherently were working at *all times*. *See id*. Defendants also argued they were never obliged to produce Nurse Nocerini's phone records; instead they were only obligated to provide information that would enable Plaintiff to obtain these records, and their production of Nocerini's name, postal address, cell phone number, and email address was sufficient. *Id.* at PageID.2569.

This Court referred Plaintiff's second Motion for Default Judgment to Judge Morris. ECF No. 105. On October 19, 2023, Judge Morris issued an R&R recommending the denial of Plaintiff's second Motion for Default Judgment because Plaintiff did not show Defendants violated discovery Orders. ECF No. 112 at PageID.2715 ("Defendants cannot give what they don't have.").

Plaintiff filed his sole objection to the R&R on November 2, 2023. ECF No. 114. Plaintiff argues that Defendants *did* violate this Court's discovery orders because they can and have produced payroll timesheets which further confirm whether a practitioner worked a particular shift. ECF No. 114. *See also* ECF Nos. 107-6 at PageID.2615 (Nurse Brinkman's timesheet); 107-6 at PageID.2616 (Nurse Reynold's timesheet). Indeed, Plaintiff argues that ACH's IT Department likely relied on such information when creating the Staffing Matrix. ECF No. 114 at PageID.2738.

Defendants responded that Plaintiff's Objection is improper because it does "nothing more than [express] disagreement with the R&R[.]" ECF No. 116 at PageID.2749. Defendants point out that they already produced Nurse Reynolds's and Nurse Brinkman's timesheets which demonstrate that neither worked at OCJ on April 28, 2019. *Id.* at PageID.2749–55. Defendants argue that the non-production of timesheets does not violate this Court's order to produce documentation confirming that on-call staff "actually worked" on certain dates because Nurse Nocerini and the other identified practitioners, did *not* "actually work" on April 28. *Id.* at PageID.2757–58. Indeed, Defendants argue that Nurse Nocerini's timesheets are irrelevant because she was the *backup*

practitioner and the *primary* practitioner—Nurse Brinkman—never received a call from OCJ, so Nurse Nocerini would not have been called either. *Id.*

## II.

Under Civil Rule 72, a party may object to and seek review of a magistrate judge's report and recommendation. *See* FED. R. CIV. P. 72(b)(2). The parties must state any objections with specificity within a reasonable time. *Thomas v. Arn*, 474 U.S. 140, 151 (1985) (citation omitted). Any objection which fails to identify specific portions of the R&R will not be reviewed. *See Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) ("A general objection to the entirety of the magistrate's report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review[.]"); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004) ("A general objection . . . is not sufficient to alert the court to alleged errors on the part of the magistrate judge. An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context."). Additionally, parties cannot "raise at the district court stage new arguments or issues that were not presented" before the R&R was issued. *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000).

If a party makes a timely, specific objection, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(3). When reviewing a report and recommendation *de novo*, this Court must review at least the evidence that was before the magistrate judge. *See Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981). After reviewing the evidence, this Court is free to accept, reject, or modify the Magistrate Judge's findings or recommendations. FED. R. CIV. P. 72(b)(3); *Peek v. Comm'r of Soc. Sec.*, No. 1:20-CV-11290, 2021 WL 4145771, at *2 (E.D. Mich. Sept. 13, 2021).

### III.

Plaintiff's sole objection will be overruled because it merely expresses disagreement with Judge Morris's conclusions by repeating the same arguments raised in his second Motion for Default Judgment, without identifying a flaw in Judge Morris' analysis. To the extent Plaintiff's objection does identify a flaw, it will still be overruled because Judge Morris did not clearly err in concluding that Defendants did not violate this Court's discovery orders.

As a threshold matter, Plaintiff's objection is improper. Judge Morris concluded—after reviewing all briefings and discovery—that the Staffing Matrix satisfied Defendant's obligation to produce "staffing schedules and any confirmation documentation that staff listed on the schedule actually worked at the time indicated on the schedule, e.g., timesheets, pay stubs, or the like[.]" ECF No. 64 at PageID.1322. In other words, Judge Morris found no underlying discovery violations to subject Defendants to sanctions—let alone the remedy of a default judgment. ECF No. 112 at PageID.2715. Plaintiff objects and argues Defendants *were* obligated to produce timesheets or other documents to further confirm the information within the Staffing Matrix. ECF No. 114 at pageID.2737–39. But this was the very argument Plaintiff made in his second Motion for Default Judgment, which Judge Morris considered and rejected. *Compare* ECF No. 104 at PageID.2520 ("What is conspicuously missing [from Defendants' production] is timesheets, payroll logs, or any other related documents that would confirm the employees that would have been responsible for medical operations on the night in question.") *with* ECF No. 114 at PageID.2737 (arguing the Staffing Matrix leaves Plaintiff with "no way of confirming which of the employees . . . worked on the night in question" and that timesheets are needed to "definitively indicate whether an employee worked"). Aside from repeating his arguments, Plaintiff cites the R&R only four times—within headings, boilerplate language, or a broad recitation of the

procedural history. *See* ECF No. 114 at PageID.2727, 2729, 2734. Indeed, Plaintiff's Objection reads like a *reply*—which Plaintiff notably did not file—in support of his second Motion for Default Judgment, countering the claims in Defendants' Response, ECF No. 107, rather than identifying flaws within Judge Morris's R&R. *See* ECF No. 114 at PageID.2734–39. Accordingly, Plaintiff's Objection will be overruled. *Lewis v. Sole L., PLLC*, 629 F. Supp. 3d 731, 735 (E.D. Mich. 2022), *motion for relief from judgment denied*, 652 F. Supp. 3d 886 (E.D. Mich. 2023) ("A district court is 'not obligated to reassess the same arguments presented before the Magistrate Judge with no identification of error in the Magistrate Judge's recommendation.'" (quoting *Nelson v. Saul*, No. 19-CV-12964, 2021 WL 688583, at *4 (E.D. Mich. Feb. 23, 2021))).

Further, to the extent Plaintiff's Objection does identify a flaw in the R&R, it does not identify *clear error*. True, timesheets were contemplated in this Court's June 2022 Scheduling Order. ECF No. 64 at PageID.1322. Recall the June 2022 Discovery Order required Defendants to produce "for the relevant time period (booking until release), staffing schedules and any confirmation documentation that staff listed on the schedule actually worked at the time indicated on the schedule, e.g., time[]sheets, pay stubs, or the like, within 45 days of this order." *Id*. The flaw in Plaintiff's argument—that Defendants violated this order by not producing the timesheets of backup practitioner Nurse Nocerini—is that it *assumes* Nurse Nocerini "actually worked" on April 28, 2019. But Defendants have repeatedly expressed their contention that she did not. *See* ECF Nos. 91; 107 at PageID.2567; 116 at PageID.2752–53.

The Parties have seemingly different perspectives on what the term "actually worked" means, as the term is used in the June 2022 Discover Order. Plaintiff interprets the term broadly and argues that, since Nurse Nocerini was identified as the backup on-call practitioner on April 28, 2019, she could have received a call, was "actually working" that day and, thus, Defendants

were obligated to produce confirming timesheets. *See* ECF No. 114 at PageID.2737–38. Defendants interpret the term narrowly and argue that, since Nurse Nocerini was not the primary on-call practitioner and was thus not responsible for routine in-person visits to OCJ from the February through June 2019, she was not "actually working" on April 28, 2019, so Defendants need not produce her timesheets. *See* ECF No. 107 at PageID.2567. Both views are plausible. And this Court's June 2022 Discovery Order did not define what the term "actually worked" meant, although perhaps it should have. Accordingly, in the absence of a clear definition, Judge Morris did not clearly err in finding that Defendants had sufficiently produced scheduling information for all those who "actually worked" on April 28, 2019.

Yet, the question remains: who withheld Plaintiff's Keppra on April 28, 2019? Defendants continue to claim, that OCJ personnel *never* called *anyone* from ACH that morning, implying that OCJ personnel are to blame. *See* ECF Nos. 107 at PageID.2548 ("ACH . . . had no involvement with [Plaintiff] at [OCJ]. They were not asked to and did not see him. No ACH staff were called or contacted about him."); ECF No. 107-8 (arguing "there can be no serious dispute of fact that the ACH on-call provider was never called on the night [Plaintiff] was detained at [OCJ] despite a policy and procedure being in place to do so."). Defendants support this claim by citing the testimony and timesheets of Nurse Reynolds (who Defendants argue wouldn't have been working on April 28, 2019 in the first instance) and the timesheets and phone records of Nurse Brinkman, the identified on-call practitioner. But, even if sufficiently supported, this claim ignores the fact that this Court sanctioned Defendants' prior discovery violations by *provisionally* establishing that "[a]t least one of the [OCJ] corrections officers called *at least one of ACH's employees* for approval to administer Plaintiff's seizure medication." ECF No. 86 at PageID.2065.

Even though Defendants did not violate this Court's discovery orders, Plaintiff has a point: where are the timesheets for Nurse Nocerini and the other practitioners Defendants identified in their Staffing Matrix? Defendants have not produced them, in accord with their view that these practitioners did not "actually work" on April 28, 2019 and would not have been contacted by OCJ. ECF No. 107 at PageID.2569. But Dr. Bresnahan testified that OCJ set its own policy for contacting ACH practitioners. ECF No. 69-2 at PageID.1364. And multiple OCJ officers testified that they would call any one of up to three ACH practitioners whose numbers were, at any given time, posted within the OCJ control room. *See* ECF Nos. 45-10 at PageID.590; 49-5 at PageID.800; 49-6 at PageID.806. So, for example, it is plausible that an OCJ officer *could* have called Nurse Nocerini, despite her backup status. Although Defendants sufficiently provided Plaintiff with Nurse Nocerini's contact information to enable Plaintiff to subpoena her phone records, Defendants have also demonstrated the ability to produce timesheets for ACH practitioners. Assuming Nurse Nocerini wanted to be compensated, her timesheet would confirm whether she provided any services to OCJ on April 28, 2019. Accordingly, although Plaintiff's Objection will be overruled, the R&R will be adopted, and Plaintiff's second Motion for Default Judgment will be denied, Defendant will be directed to supplement its production to include Nurse Nocerini's payroll timesheet, as well as the timesheets of Joseph Mashni and Wilma Kagarise—the other identified on-call practitioners assigned to OCJ from February through July 2019. [9] *See* FED. R. CIV. P. 26(e)(1)(B); *Trapp v. Fed. Express Corp.*, 647 F. Supp. 3d 567, 571 (E.D. Mich. 2022) (denying sanctions but, under the court's broad discretion to supervise discovery, requiring

---

[9] Although the Staffing Matrix also identified five other medical professionals, ECF No. 104-2 at PageID.2533, Defendants explained that the Regional Medical Director and the four identified regional nurse managers "were not on-call for OCJ meds" and, unlike the four identified on-call practitioners, would not have plausibly received a call from OCJ personnel on April 28, 2019 to approve Plaintiff's medication. *See* ECF No. 107 at PageID.2568.

plaintiff to supplement disclosures when doing so would "shine a light on any evidence lying in wait" and when plaintiff could produce the evidence "with ease"); *see also Everlight Elecs. Co. v. Nichia Corp.*, No. 12-CV-11758, 2015 WL 412184, at *1 (E.D. Mich. Jan. 30, 2015) ("The duty to supplement discovery does not cease upon the close of the applicable discovery period. Courts have held that discovery is incomplete . . . if there is an objectively reasonably likelihood that the additional . . . information could substantially affect or alter the opposing party's . . . trial preparation." (internal quotations omitted)).

If the timesheets for Nocerini, Mashni, and Kagarise do not reflect that they worked at OCJ on April 28, 2019, the provisionally established fact that "[a]t least one of the corrections officers supervising Plaintiff's detention called one of ACH's employees to seek permission to administer Plaintiff's medication[,]" ECF No. 86 at PageID.2065, will no longer be provisionally established, and Plaintiff will be left to his proofs.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff's Objection to Judge Morris's Report and Recommendation, ECF No. 114, is **OVERRULED.**

Further, it is **ORDERED** that Judge Morris's Report and Recommendation, ECF No. 112, is **ADOPTED.**

Further, it is **ORDERED** that Plaintiff's second Motion for Default Judgment, ECF No. 104, is **DENIED.**

Further, it **ORDERED** that Defendants are **DIRECTED** to produce to Plaintiff and file on the record, **on or before February 20, 2024**, payroll timesheets for (1) Jill Nocerini; (2) Joseph Mashni; and (3) Wilma Kagarise reflecting whether these identified on-call practitioners logged time for payment on April 28, 2019 at OCJ, similar to the timesheets Defendants already produced,

*see* ECF Nos. 107-6 at PageID.2615 (Nurse Brinkman); 107-6 at PageID.2616 (Nurse Reynolds). If these timesheets do not show that any of these practitioners logged work hours at OCJ on April 28, 2019, this Court will no longer provisionally establish that "[a]t least one of the corrections officers supervising Plaintiff's detention called one of ACH's employees to seek permission to administer Plaintiff's medication." *See* ECF No. 86 at PageID.2065.

    **This is not a final order and does not close the above-captioned case.**

Dated: February 5, 2024        s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge