UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL VICTOR,

        Plaintiff,                          Case No. 1:20-cv-13218

v.                                            Honorable Thomas L. Ludington
                                                United States District Judge
ADVANCED CORRECTIONAL
HEALTHCARE, INC.,                      Honorable Patricia T. Morris
                                                United States Magistrate Judge

        Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S FOURTH MOTION FOR SANCTIONS**

Like many correctional facilities throughout the country, the Otsego County Jail (OCJ) in Michigan does not have its own nurses or medical staff to provide inmates with healthcare. Instead, OCJ contracted with Advanced Correctional Healthcare, Inc. (ACH), a private company responsible for assigning medical professionals to serve OCJ through in-person shifts and on-call capacities.

On April 28, 2019, Plaintiff Michael Victor was arrested for disorderly, intoxicated conduct and was confined at OCJ. Plaintiff has epilepsy and regularly takes medication to prevent seizures. Although Plaintiff's mother quickly delivered his antiseizure medication to OCJ, Plaintiff never received it. Minutes after his release, Plaintiff suffered a grand mal seizure, fell face face-first onto cement, and broke his jaw. In March 2024, a jury found that OCJ's contractual inmate healthcare provider—Defendant Advanced Correctional Healthcare, Inc. (ACH)—had a custom of withholding inmate medication which caused the deliberate indifference of Plaintiff's objectively serious medical needs in violation of the Eighth Amendment and 42 U.S.C. § 1983.

On the third day of trial—before the jury awarded Plaintiff over $700,000 in damages—Plaintiff filed a motion seeking "severe" sanctions. Plaintiff argues that trial testimony revealed Defendants obfuscated discovery and defrauded the Court. But Plaintiff mischaracterizes the relevant trial testimony and misplaces his sanction arguments. Thus, as explained below, his motion will be denied.

I.

Just after midnight on April 28, 2019, Plaintiff Michael Victor was arrested outside a bar for disorderly conduct and was transported to Otsego County Jail (OCJ). ECF No. 38 at PageID.432. Plaintiff has epilepsy and, at around 1:00 AM, Plaintiff's mother arrived at OCJ and delivered Plaintiff's anti-seizure medication, Keppra, to law enforcement, explaining Plaintiff's medical needs. *Id.* at PageID.433; ECF No. 45-11 at PageID.606. But Plaintiff never received his medication. Minutes after he was released from OCJ around 11:30 AM, Plaintiff suffered a seizure, fell face-first onto the cement, and broke his jaw. ECF No. 38 at PageID.435–36.

In December 2020, Plaintiff sued (1) Otsego County; (2) Officer Blake Huff; (3) the City of Gaylord; (4) Advanced Correctional Healthcare, Inc. (ACH), OCJ's contractual inmate-healthcare-provider; and (5) Nurse Kimberly Reynolds, an ACH nurse Plaintiff alleged worked at OCJ while he was confined there and was responsible for his medication being withheld. ECF No. 38. But, after two sets of voluntary dismissals, the only Defendants remaining at the March 2024 trial were ACH and Nurse Reynolds. *See* ECF Nos. 29; 36. After trial, the jury found Nurse Reynolds not liable because she did not work at OCJ the morning Plaintiff was confined there, and Plaintiff did not prove she otherwise knew about his medical needs. *See* ECF No. 165 at PageID.3905. But the jury found Defendant ACH was deliberately indifferent to Plaintiff's objectively serious medical needs, in violation of the Eighth Amendment and 42 U.S.C. § 1983,

and awarded Plaintiff $20,000 in economic damages, $50,000 in noneconomic damages, and $700,000 in punitive damages. *See* ECF No. 165.

Plaintiff promptly filed a motion for attorney's fees, ECF No. 173, and Defendants filed motions for judgment as a matter of law, ECF No. 175, a new trial, ECF No. 180, and an amended judgment, ECF No. 181. These motions remain pending and will be addressed in a separate Opinion. This Opinion resolves Plaintiff's March 14, 2024 motion for "severe" sanctions, filed on the third day of the week-long trial. ECF No. 160. But this is not the first time Plaintiff has sought sanctions. It is the *fourth*. *See* ECF Nos. 69; 104; 146. The two-year convoluted discovery dispute that prompted these motions is detailed below.

## A. Early Discovery Disputes

In February 2022, Defendants filed a Motion for Summary Judgement. ECF No. 45. Plaintiff responded that discovery was incomplete, ECF No. 48, and filed a motion to compel. ECF No. 54. These motions were referred to Magistrate Judge Patricia T. Morris who, in June 2022, granted Plaintiff's motion to compel in part, and ordered Defendants to produce:

(1) "a representative from ACH who provided active management of the contract between [OCJ] and ACH at the time of the incident in the complaint within 60 days;"

(2) either "[A] phone records (cellular or otherwise) of all persons who were working or on a call during the relevant time period of the incident alleged in the complaint, i.e., from the time Plaintiff was booked until he was released on April 28, 2019, or [B] authorization and any information necessary to provide Plaintiff the ability to access those records from any phone provider within 30 days[;]" and

(3) "for the relevant time period (booking until release), staffing schedules and any confirmation documentation that staff listed on the schedule *actually worked* at the time indicated on the schedule, e.g., time sheets, pay stubs, or the like, within 45 days[.]"

ECF No. 64 at PageID.1321–22 (emphasis added) (the "June 2022 Discovery Order").

Judge Morris also directed Defendants to produce eight different categories of documents, which Plaintiff requested in a notice of taking deposition duces tecum. ECF No. 83 at PageID.2006. This notice sought production of (1) "ACH's staffing information (including the identities and days worked) for on-call providers scheduled to be on call and who was on call at OCJ from January 1, 2019 to January 1, 2021"; (2) "[a]ll instances of complaints . . . of either ACH providing inadequate medical care or having inadequate staffing for a prison where ACH was contracted by a prison facility in the Midwest region since 2017"; and (3) "ACH's complete staffing schedule for OCJ from January 1, 2019 to January 1, 2021, including the identities of any ACH employees who worked during this time." ECF No. 54-3 at PageID.882–83.

On July 5, 2022, Plaintiff deposed Dr. Jill Bresnahan—ACH's selected representative. ECF No. 69-2. But Dr. Bresnahan did not "provide active management of the contract" between OCJ and ACH on April 28, 2019, because she was not employed with ACH at the time. See *id*. at PageID.1367, 1398; *see also* ECF No. 83 at PageID.2006. Nevertheless, Dr. Bresnahan testified that ACH did not have many of the policies or procedures Plaintiff sought and accordingly could not and did not produce the documents Plaintiff requested and this Court ordered. *See* ECF No. 69-2 at PageID.1354–66; *see also* ECF No. 54-3 at PageID.882–83. Instead, Dr. Bresnahan explained that the jails set their own policies for staffing and contacting ACH practitioners, and each ACH practitioner scheduled their shifts through the serviced jail, not ACH. ECF No. 69-2 at PageID.1354, 1364, 1370, 1376, 1379. Thus, Dr. Bresnahan testified that ACH did not *proactively* create or maintain "schedules" for its practitioners; it only *reactively* knew when a practitioner worked for a serviced jail if that practitioner logged their worked time into ACH's online payroll system, Paycom. *Id*. at PageID1377.

Dr. Bresnahan also testified that Nurse Courtney Brinkman—not Nurse Reynolds—was ACH's primary on-call practitioner for OCJ on April 28, 2019. ECF No. 69-2 at PageID.1380. And although Defendants later explained that Nurse Brinkman no longer worked for ACH, Defendants provided Plaintiff with her cell phone number and a signed, notarized authorization to allow Plaintiff to obtain her phone records. ECF No. 107 at PageID.2554. In August 2022, Defendants supplementally produced Nurse Brinkman's subpoenaed phone records which confirmed she neither called OCJ nor received a call from OCJ on April 28, 2019. *Id.* at PageID.2555–56; *see also* ECF No. 107-7 at PageID.2621–28. Defendants also produced Nurse Brinkman's timesheets, which further reflected that she did not service OCJ on April 28, 2019. *See* ECF Nos. 107 at PageID.2555; 107-6 at PageID.2615.

### B. Plaintiff's First Motion for Default Judgment

Plaintiff filed his first Motion for Default Judgement in October 2022, arguing Defendants violated the June 2022 Discovery Order. ECF No. 69. Judge Morris agreed and concluded that Defendants violated the June 2022 discovery order by (1) failing to provide documented complaints of inadequate medical care and staffing and (2) failing to provide scheduling information and phone records of backup practitioners. ECF No. 83. Yet Judge Morris recommended this Court deny Plaintiff's first Motion for Default Judgement because this drastic remedy was unwarranted. *Id.* at PageID.2025. Accordingly, this Court denied Plaintiff's Motion, directed Defendants to cure the two discovery violations on or before January 30, 2023, and sanctioned Defendants by directing the following facts provisionally established:

> (1) ACH has had some instances of complaints that it either provided inadequate medical care or had inadequate staffing for a prison facility in the Midwest region since 2017[;] [and]
>
> (2) One of the corrections officers supervising Plaintiff's detention called one of ACH's employees to seek permission to administer Plaintiff's medication.

ECF No. 86 (internal citations omitted).

To cure the first violation, Defendants produced a "Loss Run Report," which contained documented complaints regarding ACH's inadequate medical care or staffing within the Midwest. ECF No. 107 at PageID.2561. To cure the second violation, Defendants produced a staffing matrix that identified nine medical professionals, importantly including *four* ACH practitioners, who serviced OCJ from February 4, 2019–July 17, 2019. ECF No. 87-4 at PageID.2106. The matrix identified that, on April 28, 2019—the night Plaintiff was confined at OCJ, Nurse Brinkman was the primary on-call ACH practitioner, and Jill Nocerini was the backup on-call practitioner. *Id.* Having already produced Nurse Brinkman's phone records, Defendants explained that Nurse Nocerini no longer works for ACH but provided her last known address, email address, and cell phone number. *Id.*

### C. Plaintiff's Second Motion for Default Judgment

Finding this production inadequate, Plaintiff filed a *second* Motion for Default Judgement in July 2023, primarily arguing that Defendants violated the June 2022 Discovery Order by not producing timesheets, payroll logs, "or any other related documents" that would confirm whether the practitioners identified in Defendants' staffing matrix served OCJ on April 28, 2019. ECF No. 104. But, overruling Plaintiff's objections and adopting Judge Morris's recommendation, this Court denied this motion because Plaintiff did not show that Defendants violated the June 2022, or any other, discovery orders. ECF No. 112 at PageID.2715.

In so doing, this Court explained that the Parties had different perspectives on what the phrase "actually worked" meant, as this phrase was used in the June 2022 Discovery Order. Recall this order required Defendants to produce "for the relevant time period . . . staffing schedules and any confirmation documentation that staff listed on the schedule *actually worked* at the time

indicated on the schedule, e.g., time[]sheets, pay stub, or the like[.]" ECF No. 64 at PageID.1322. Plaintiff interpreted the phrase broadly, and contended that, since Nocerini and was identified as a backup on-call practitioner on April 28, 2019, she was "actually working" that day and Defendants were accordingly obligated to produce confirming timesheets. *See* ECF No. 114 at PageID.2737–38. But Defendants interpreted the phrase narrowly and argued that, since Nurse Nocerini was *not* the primary on-call practitioner and was thus not responsible for routine in-person visits to OCJ from February through June 2019, she was not "actually working" on April 28, 2019, and they need not produce her timesheets. *See* ECF No. 107 at PageID.2567.

This Court noted that , in the absence of a clear definition, "both" perspectives were "plausible" such that Judge Morris did not err when she concluded that Defendants did *not* violate the June 2022 Discovery Order by not producing additional timesheets. ECF No. 135 at PageID.3386. Yet, despite denying Plaintiff's second motion for default, this Court noted:

> Even though Defendants did not violate this Court's discovery orders, Plaintiff has a point: where are the timesheets for Nurse Nocerini and the other practitioners Defendants identified in their Staffing Matrix? Defendants have not produced them, in accord with their view that these practitioners did not "actually work" on April 28, 2019 and would not have been contacted by OCJ. But Dr. Bresnahan testified that OCJ set its own policy for contacting ACH practitioners. And multiple OCJ officers testified that they would call any one of up to three ACH practitioners whose numbers were, at any given time, posted within the OCJ control room. So, for example, it is plausible that an OCJ officer could have called Nurse Nocerini, despite her backup status. Although Defendants sufficiently provided Plaintiff with Nurse Nocerini's contact information to enable Plaintiff to subpoena her phone records, Defendants have also demonstrated the ability to produce timesheets for ACH practitioners. Assuming Nurse Nocerini wanted to be compensated, her timesheet would confirm whether she provided any services to OCJ on April 28, 2019. Accordingly . . . Defendant will be directed to supplement its production to include Nurse Nocerini's payroll timesheet, as well as the timesheets of Joseph Mashni and Wilma Kagarise—the other identified on-call practitioners assigned to OCJ from February through July 2019.
>
> If the timesheets for Nocerini, Mashni, and Kagarise do not reflect that they worked at OCJ on April 28, 2019, the provisionally established fact that "[a]t least one of the corrections officers supervising Plaintiff's detention called one of ACH's

> employees to seek permission to administer Plaintiff's medication[,]" ECF No. 86 at PageID.2065, will no longer be provisionally established, and Plaintiff will be left to his proofs.

ECF No. 135 at PageID.3386–87 (internal citations omitted).

On February 13, 2024, Defendants produced all timesheets this Court requested. ECF No. 141. Each time sheet showed that the respective ACH practitioner did *not* service OCJ on April 28, 2019. ECF No. 141-1 at PageID.3438 (Nocerini); PageID.3451 (Mashni); PageID.3459 (Kagarise). Accordingly, this Court removed the prior provisionally established fact that at least one OCJ officer called at least one of ACH's employees from the jury instructions. *See* ECF No. 162 at PageID.3873.

### D. Plaintiff's Third Motion for Default Judgment

Three weeks before trial, *see* ECF No. 115, Plaintiff filed a *third* Motion for Default Judgment.[1] ECF No. 146. The only *new* argument Plaintiff asserted was that Defendants' court-ordered, supplemental production of timesheets shows that they *could have* produced the timesheets two years earlier, as Plaintiff contended the June 2022 Discovery order directed. *Id.* at PageID.3531.

But this Court denied Plaintiff's third Motion for Default Judgment because—consistent with its prior Opinion that Defendants did not violate the June 2022 Discovery Order by not producing time sheets for ACH employees who did not "actually work" at OCJ throughout the relevant period—"Plaintiff [did] not show[] that Defendants violated this Court's discovery orders." ECF No. 154 at PageID.3699 ("[T]his Court already rejected Plaintiff's argument—at the

---

[1] The Motion was titled "Plaintiff's Motion for for Sanctions Including but not Limited to Provisionally Established Facts, Adverse Inference, Default, and or Relief From Order Pursuant to Fed. R. Civ. P. 60(b)." ECF No. 146 at PageID.3512 (emphasis omitted, duplicate word in original). And although the Motion sought alternative lesser sanctions, it primarily sought a default judgment. *Id.* at PageID.3522.

- 8 -

core of his second Motion for Default Judgment—that the June 2022 Discovery Order required Defendants to produce timesheets for practitioners who did not "actually work" on April 28, 2019. Defendants' subsequent, additional production of Nurse Nocerini's timesheet—along with the timesheets of two other ACH practitioners who were not even scheduled to be on call at OCJ while Plaintiff was confined there—does not violate this Court's discover[y] orders." (internal citations omitted)). "And even if Defendants conduct was violative," this Court reasoned, "sanctions—let alone default judgment—are unwarranted" because "[n]othing suggests that Defendants' timely production of the additional timesheets was in bad faith," and the additional supplemental production did not prejudice plaintiff in any way. *Id.* at PageID.3700.

### E. Plaintiff's Fourth Motion for Sanctions

Undeterred, Plaintiff filed a *fourth* motion for sanctions in the middle of trial. ECF No. 160. Defendants responded on March 28, 2024. ECF No. 169. Plaintiff—after securing a successful verdict at trial—did not file a reply.

It is unclear what specific type of sanctions Plaintiff seeks. In one breath, he expressly requests this Court "reinstate[] the provisional finding of fact" that someone from OCJ called someone from ACH regarding Plaintiff's medical needs on April 28, 2019. *See* ECF No. 160. In the next breath, Plaintiff generally seeks "severe sanctions" and recites legal principles relevant to the default judgment analysis.[2] *Id.* Regardless, Plaintiff seeks these sanctions for two separate reasons governed by two separate standards. Each will be analyzed in turn.

---

[2] The post-trial posture of this motion is a bit puzzling. On one hand, Plaintiff's requests for (1) the "reinstatement of the provisional finding[] of fact" that someone from OCJ called someone from ACH and (2) the "severe sanction" of default judgment are seemingly moot, because (1) this Court instructed the jury without reinstating the prior provisionally established fact, and (2) the jury returned a verdict in Plaintiff's favor. On the other hand, given Defendants' pending post-trial motions for judgment as a matter of law and a new trial, the jury verdict is not *technically* final.

**II. Rule 37 Sanctions: ACH's Training Materials**

Citing the trial testimony of various ACH employees that ACH oriented them and provided training materials, Plaintiff first seeks sanctions under Civil Rule 37 because, in his view, Defendants should have produced these orientation and training materials during discovery in 2022. *See id.*

**A.**

Some additional context is necessary. Over two-and-a-half years ago, to support his *Monell* failure-to-train claim against ACH, Plaintiff requested Defendants "produce an employee handbook and/or training materials provided to either Kimberly Reynolds or other ACH employees tasked with providing medical care at [OCJ] *regarding their duties to provide medical care*." ECF No. 54-2 at PageID.876 (emphasis added). Defendants did not produce any handbooks or training materials, and instead responded in April 2022 that ACH's "[h]ealth care providers and LPN's have formal education sufficient to obtain a state license" and that, "[w]hile working at [OCJ]," each practitioner "follow[s] the directives of the Sheriff Department and use[s] their [own] medical . . . or nursing judgment." *Id.* at PageID.877.

Separately, recall that part of the June 2022 Discovery Order required ACH's deponent to "produce various documents belonging to eight[] distinct 'topics'" which Plaintiff requested in his February 2022 notice of taking deposition duces tecum. *See* ECF No. 83 at PageID.2006 (referring to ECF Nos. 54-3; 64). One topic concerned "[t]raining for ACH medical personnel regarding their duties . . . *as it pertains to medical care* provided at Otsego County Jail." ECF No. 55-2 at PageID.1036 (emphasis added). As explained, Defendants' deponent—Dr. Bresnahan—did not

---

*See* ECF Nos. 175; 180. Neither Party addresses this posture. For completeness, this Court will assume *arguendo* that Plaintiff's motion is not moot and will accordingly analyze its merits.

produce any training documents and testified at her deposition that ACH does not provide *medical* training to its healthcare practitioners. *See* ECF No. 69-2 at PageID.1391–93 ("ACH does not have policies, procedures or practices for health care providers on how to practice medicine. They come to us trained already."). However, Dr. Bresnahan testified that ACH had "*HR-related* policies" and that she would "be happy to" provide such policies to Plaintiff. *Id.* at PageID.1354 (emphasis added). Ultimately, this Court excused Defendants' nonproduction. Although Defendants violated the June 2022 Discovery Order by not producing *medical* training documents, "ACH carried its burden in establishing that it could not comply with" the discovery order because such documents did not exist. ECF No. 83 at PageID.2015. And although Defendants did not produce ACH's "HR-related" policies, this Court concluded these policies were outside the scope of Plaintiff's request and this Court's enforcing June 2022 Discovery Order. *Id.*, n. 4. ("Bresnahan did testify that ACH possessed "HR-related policies," but [Plaintiff] does not explain how these . . . policies would fall within the scope of his request.").

Fast-forward to trial in March of 2024. Plaintiff called Jill Nocerini—the backup ACH practitioner on call to service OCJ on April 28, 2019. During direct examination, Nocerini testified that she attended a "two and a half day training" at ACH's headquarters when she began her employment there, ECF No. 168 at PageID.4107, 4111–12, and received an "employee handbook" and "training manual." *Id.* at PageID.4112–13. Plaintiff's Counsel proceeded to read into the record Plaintiff's 2022 discovery request for "an employee handbook and/or training materials provided to . . . ACH employees tasked with providing medical care at [OCJ] providing their duties to provide medical care" and Defendants' response that such providers rely on their education and medical judgment. *Id.* at PageID.4119–20 (referring to ECF 54-2 at PageID.876–77). Plaintiff's Counsel then asked Nocerini whether Defendants' 2022 discovery response was accurate

considering her testimony that she received training and had a handbook, but Nocerini responded, "I really can't answer that properly," and Plaintiff's Counsel proceeded to other lines of questioning.[3] *Id.* at PageID.4120. On cross-examination, Nocerini clarified that "nothing" in the handbook and training manuals she received addressed "what her duties were with respect to [responding to] a phone call [from an assigned jail] and prescribing medication." *Id.* at PageID.4121.

Plaintiffs also called Jill Bresnahan as a witness. On direct, Bresnahan testified that, although ACH did not provide its practitioners with medical training, it did orient its employees concerning "ACH and jail medicine." *Id.* at PageID.4188. Bresnahan explained that, although it varied from year to year, the orientation consisted of a "one day 8-hour class." *Id.* When Plaintiff's Counsel asked if ACH provided a training manual throughout this orientation, Bresnahan responded that she did not recall. *Id.* Nurse Reynolds also took the stand and testified that she, unlike Nocerini, never attended a training or orientation at ACH's headquarters and never received any "books . . . or training manuals." *Id.* at PageID.4232–33.

Plaintiff contends this trial testimony squarely contradicts Defendants' prior discovery disclosures, and accordingly seeks "severe" sanctions under Civil Rule 37 for Defendants' alleged failure to cooperate in discovery. *See* ECF No. 160.

---

[3] Notably, Plaintiff's counsel was already contemplating filing the instant motion for sanctions, and indicated on the record that he would "ask the Court for the opportunity to move the Court for a sanction based on the discovery violation." ECF No. 168 at PageID.4118. The undersigned asked Plaintiff to explain the purported violation, and Plaintiff's Counsel responded that Defendants "said they didn't have any training materials [but Nocerini] said she was trained." *Id.* The undersigned replied, "I'm not sure that you're accurate in reaching that . . . conclusion from these materials [but] [w]e'll deal with that later." *Id.*

B.

If a party violates or fails to comply with discovery orders, Rule 37(b) authorizes district courts to sanction the party "in a variety of ways, including dismissal . . . or enter[ing] [a] default judgment[.]" *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (citing FED. R. CIV. P. 37(b)(2)(C)); *see also Kucinskas v. Fleetwood Motor Homes of Indiana, Inc.* No. 06-12195, 2008 WL 4378105, at *1 (E.D. Mich. Sept. 23, 2008). But a default judgment is a "drastic" remedy "which should be [awarded] only in the most extreme cases[.]" *Stooksbury v. Ross*, 528 F. App'x 547, 552 (6th Cir. 2013) (quoting *United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th Cir.1983)). Rule 37 sanctions, including a default judgment, are discretionary and reviewed for abuse of this discretion on appeal, *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 488, 491 (6th Cir. 2014), by applying the following *Freeland* factors:

(1) whether a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault;

(2) whether the adversary was prejudiced by the party's failure to cooperate in discovery;

(3) whether the party was warned that failure to cooperate could lead to the sanction; and

(4) whether less drastic sanctions were first imposed or considered.

*Victor v. Reynolds*, 649 F. Supp. 3d 499, 505 (E.D. Mich. 2023), *reconsideration denied*, No. 1:20-CV-13218, 2023 WL 4157616 (E.D. Mich. June 23, 2023) (citing *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997)); *see also Doe v. Lexington-Fayette Urb. Cnty. Gov't*, 407 F.3d 755, 766 (6th Cir. 2005)

C.

Plaintiff's first request for sanctions fails at the first step. Plaintiff has not shown that Defendants failed to cooperate in discovery or comply with any Court order.

Plaintiff contends that Nocerini's, Bresnahan's, and Reynolds' trial testimony collectively contradict ACH's prior disclosures and show that Defendants *could have* produced training manuals and employee handbooks years ago. But the record reveals no contradiction. As explained above and in prior Opinions, Plaintiff narrowly requested Defendants produce documents related to ACH practitioners' *medical* training. *See, e.g.*, ECF Nos. 54-2 at PageID.876 (requesting Defendants "produce an employee handbook and/or training materials provided to either Kimberly Reynolds or other ACH employees tasked with providing medical care at [OCJ] regarding their duties to provide medical care."); 55-2 at PageID.1036 (requiring Defendants to produce documents related to "[t]raining for ACH medical personnel regarding their duties . . . as it pertains to medical care provided at Otsego County Jail."). Dr. Bresnahan testified—at both her deposition and trial—that such documents do not exist because ACH does not provide medical training to its practitioners. *See* ECF Nos. 69-2 at PageID.1391–93l; 168 at PageID.4187–88. No ACH employee testified at trial to the contrary. Although Bresnahan, Nocerini, and Reynolds all testified that ACH provided some training about its business and had some form of "HR-related" policies, this Court has already held that documents related to these kinds of training and policies fell outside the scope of Plaintiff's discovery requests and this Court's enforcing discovery orders. ECF No. 83 at PageID.2015, n. 4. And although Nocerini specifically testified that she received an ACH "employee handbook," she clarified that "nothing in" the handbook "trained [her] on what [her] duties were with respect to" responding to calls from jails or prescribing medication. ECF No. 168 at PageID.4121.

At bottom, Plaintiff has not shown—and the record does not support—that Defendants failed to cooperate in discovery by not producing "HR-related" policies and an employee handbook that did not concern medical training and were not requested by Plaintiff. And, even if

Plaintiff had made such preliminary showing, he has not shown such discovery failure was willful or intentional. *See generally* ECF No. 160. Rule 37 sanctions are unwarranted.

### III. Fraud on the Court: Timesheets and "On Call" Providers

Citing the testimony of ACH nurses that they were "on-call" at assigned jails "24/7," Plaintiff also seeks sanctions because, in his view, Defendants committed "fraud upon the court" by suggesting the opposite throughout prior discovery disclosures. *See* ECF No. 160. This argument is misplaced and meritless.

#### A.

Recall that, in February 2024, this Court ordered Defendants to produce "payroll timesheets for (1) Jill Nocerini; (2) Joseph Mashni; and (3) Wilma Kagarise reflecting whether these identified on-call practitioners logged hours worked at OCJ on April 28, 2019, similar to the timesheets Defendants already produced for Nurse Brinkman and Nurse Reynolds. ECF No. 135 at PageID.3387–88 (internal citations omitted). Defendants timely filed these supplemental timesheets on February 13, 2024. ECF No. 141. Each timesheet showed that each practitioner did *not* log any work hours at OCJ on April 28, 2019. *See* ECF No. 141-1. So Defendants added a red box on each timesheet to direct the Court's attention to the relevant date, noting that the practitioner did not work:



ECF No. 141-1 at PageID.3438.

At trial, Jill Nocerini testified that she—like all ACH practitioners—was on-call at her assigned jails 24/7. ECF No. 168 at PageID.4105. Nocerini also explained that, although her timesheet reflected her *physical* presence at any assigned jail on any specific day, it would not reflect whether she received a call from an assigned jail but failed to answer or respond.[4] *Id.* at PageID.4103–05.

In light of this testimony, Plaintiff argues that Defense Counsel's assertion in the red boxes on each practitioner's timesheets—that each practitioner did not "work at OCJ" on April 28, 2019—amounted to "fraud upon the court." *See* ECF No. 160.

---

[4] Notably, though, Nocerini does not recall ever *missing* a phone call from any of the jails she was assigned to, and testified that, when on call, she "had [her] personal phone on her" at all times and would "always [answer her] phone," even if she was previously asleep. ECF No. 168 at PageID.4105.

B.

Federal courts "have the inherent authority to sanction bad faith conduct." *Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 872 (E.D. Mich. 2017) (citing *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 301–02 (6th Cir. 2016); *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (noting federal courts' "inherent power" to sanction parties who "perpetrate[]" fraud). But "the Sixth Circuit has repeatedly emphasized that the court's inherent power to sanction 'must be exercised with restraint and discretion,'" and that such inherent power should only be wielded in response to truly "'impermissible conduct that adversely impacts the entire litigation.'" *Plastech*, 257 F. Supp. 3d at 872 (quoting *Murray v. Columbus*, 534 F. App'x 479, 484–85 (6th Cir. 2013)).

Plaintiff argues that Defense Counsel should be sanctioned for committing "fraud upon the court," equating this with sanctionable bad-faith conduct. *See* ECF No. 160 (reciting five-factor fraud-on-the-court test). But the two cannot be equated. *See Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 302 (6th Cir. 2016) (explaining that the five-factor "fraud-on-the-court test" is used to decide "whether a judgment should be vacated" *not* whether a party should be sanctioned for bad faith or "stonewalling" litigation tactics). Although misframed by Plaintiff, the issue is thus whether Defense Counsel "showed bad faith by hampering the enforcement of a court order." *Id.* (internal quotations omitted and cleaned up). Logically, this issue turns on two questions: (1) did Defense Counsel "engage in conduct that hampered the enforcement of a court order?" (2) If so, did Defense Counsel "act in bad faith?" *Id.*

C.

The answer to both questions is "no." Defendant's timesheet production, in fulfillment of this Court's February 5, 2024 Order did not hamper or otherwise frustrate any court order. *See*

ECF No. 135 at PageID.3387–88 (directing Defendants to produce supplemental payroll timesheets). And Defense Counsel did not act in bad faith by adding the assertions that the timesheets did "not reflect" that these practitioners "worked at OCJ" on April 28, 2019. True, as Nocerini testified, the timesheets would not show whether OCJ *called* any ACH practitioner *if* that practitioner missed the call or failed to respond to it. But neither Defendants nor their Counsel made any assertions to the contrary. By quoting this Court and noting these practitioners did not work *at OCJ* on April 28, 2019, Defense Counsel merely reiterated what this Court, numerous witnesses, and Plaintiff's Counsel herself stated numerous times: "[t]he time sheets . . . show when [the ACH practitioners] actually went to the jail." ECF No. 170 at PageID.4402; *see also* ECF No. 135 at PageID.3386 ("Assuming Nurse Nocerini wanted to be compensated, her timesheet would confirm whether she provided any services to OCJ on April 28, 2019"); ECF No. 168 at PageID.4103 (testifying that the timesheets would reflect the time ACH practitioners "were actually there" at assigned jails). So, Plaintiff has not shown—and the record does not suggest—that Defense Counsel engaged in bad-faith conduct subject to sanctions.

## IV.

Accordingly, it is **ORDERED** that Plaintiff's Fourth Motion for Sanctions, ECF No. 160, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**

Dated: February 14, 2025                  s/Thomas L. Ludington
                                          THOMAS L. LUDINGTON
                                          United States District Judge