UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL VICTOR,

                    Plaintiff,                      Case No. 1:20-cv-13218

v.                                            Honorable Thomas L. Ludington
                                            United States District Judge

ADVANCED CORRECTIONAL
HEALTHCARE, INC.,                      Honorable Patricia T. Morris
                                            United States Magistrate Judge

                    Defendant.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW; (2) CONDITIONALLY GRANTING DEFENDANT'S MOTION FOR A NEW TRIAL; (3) VACATING MARCH 2024 JUDGMENT; (4) ENTERING JUDGMENT IN FAVOR OF DEFENDANT; (5) DENYING DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT AS MOOT; AND (6) DENYING PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AS MOOT**

In the early morning on April 28, 2019, Plaintiff Michael Victor was arrested for disorderly conduct and transported to the Otsego County Jail (OCJ) in Gaylord, Michigan. Plaintiff has epilepsy and regularly takes medication to prevent seizures. But when he was arrested, Plaintiff had not taken his anti-seizure medication for several hours and did not have any medication on his person. Although his mother knew of his arrest and later brought his medication to OCJ, the medication never made it to Plaintiff, who, minutes after being released from OCJ around noon, suffered a grand mal seizure, fell face first onto the cement, and broke his jaw.

Among other Defendants, Plaintiff alleged Defendant Advanced Correctional Healthcare, Inc. (ACH) was deliberately indifferent to his objectively serious medical needs in violation of the Eighth Amendment and 42 U.S.C. § 1983. But no ACH employee was physically present at OCJ the morning Plaintiff was confined. So, to succeed on his *Monell* claim, Plaintiff needed to prove that at least one OCJ officer called or otherwise contacted at least one ACH employee regarding

Plaintiff's medication. But, throughout a four-day trial in March 2024, Plaintiff presented no such proof. So the jury's verdict for Plaintiff on this claim must be vacated. As explained below, ACH is entitled to judgment as a matter of law on this *Monell* claim and an alternative, conditional new trial.

## I.

### A. Background Facts

Nearly twenty years ago, Plaintiff Michael Victor was diagnosed with epilepsy. ECF No. 167 at PageID.4046–47. To mitigate this diagnosis, Plaintiff takes an anti-seizure medication—Keppra—two times per day. *Id.* at PageID.4046–50. If Plaintiff forgets a dose and a day passes without him taking Keppra, he will almost certainly suffer a seizure. *See id.* at PageID.4049–50. His seizure risk also increases when he consumes alcohol. *Id.* at PageID.4053 ("If I was drinking, . . . I needed to take my Keppra [because] drinking . . . would make me more able to have a seizure[.]"). Indeed, Plaintiff has historically suffered multiple seizures after drinking and forgetting to take his medication. *Id.* at PageID.4049.

On April 27, 2019, Plaintiff went to his friend Zach Corby's house around 3:00 PM to "get a buzz on." *Id.* at PageID.4084–85. Plaintiff drank between six and twelve beers before he and Corby proceeded to a bar around 9:00 PM. *Id.* at PageID.4082–85. Although Plaintiff took a bottle of Keppra with him to Corby's house, he "did not take" the medication before leaving for the bar, and "did not take" the bottle with him to the bar. *Id.* at PageID.4083; *see also id.* at PageID.4087 ("I planned on coming home—or coming back to Zach's after the bar and taking my medication [then]."). At the bar, Plaintiff got "drunk" and argued with the bouncer. *Id.* at PageID.4086, 3989–91. The police were called. *See* ECF No. 38 at PageID.432. Gaylord Police Officer Blake Huff responded and arrested Plaintiff for disorderly conduct. ECF No. 38 at PageID.432. Just after

midnight on April 28, 2019, Officer Huff brought Plaintiff to the Otsego County Jail (OCJ) in Gaylord, Michigan, and contacted his father, who, at the time, worked as an Otsego County prosecutor. *See* ECF No. 167 at PageID.3962. Corby also called Plaintiff's parents and told them Plaintiff was arrested and did not have his Keppra. *Id.* at PageID.3995.

Like many correctional institutions across the country, OCJ did not employ its own medical professionals. Instead, it contracted with Defendant Advanced Correctional Healthcare, Inc. (ACH) to employ these professionals and provide inmate healthcare.[1] *See* ECF No. 45-2. Under the terms of their contract, ACH provided OCJ with eight hours of "on-site" physical "nursing coverage" per week, at a schedule set by OCJ. *Id.* at PageID.511. ACH also assigned "physician[s]" and "mid-level practitioner[s]" to visit OCJ "every other week" and "stay until all work is completed." *Id.* Aside from this "on-site" coverage, all assigned physicians and mid-level practitioners were "on-call" 24/7 to answer questions or respond to inmate medication requests. *Id.*

Around 1:00 AM on April 28, 2019, Plaintiff's mother—Mary Curran—arrived at OCJ and delivered his Keppra to Officer Huff, explaining its seizure-preventing importance. ECF No. 167 at PageID.3963–64. Because OCJ would not give inmates medication unless approved by an ACH medical professional, *see id.* at PageID.4012–13; ECF No. 168 at PageID.4131–32, 4144–45, 4183, and because no ACH professional was physically present at the jail, Officer Huff told Curran that Plaintiff could not have his Keppra until it was "clear[ed]." ECF No. 167 at PageID.3963. But Plaintiff did not receive his Keppra until he was released from OCJ around 11:30 AM. *Id.* at PageID.4060–61. Minutes later, as Plaintiff was walking to a bench across the

---

[1] ACH describes itself as "the nation's largest jail contract management company" and services over 285 correctional facilities across 19 states *About*, ADVANCED CORR. HEALTHCARE, INC., https://www.advancedch.com/about (last visited Feb. 5, 2025) [https://perma.cc/9UBB-X7CN].

street, he suffered a grand mal seizure, fell face-first onto the cement, and broke his jaw. *See id.* at PageID.4063–66. Plaintiff underwent extensive emergency surgery, and his jaw was wired shut for over a month. *See id.* at PageID.3973, 4064–65.

What happened at OCJ between Plaintiff's booking and release remains largely unclear. But one question permeated this case's procedural posture, precluded summary judgment, and puzzled the jury at trial: did an OCJ officer ever contact an ACH employee about Plaintiff's medication?

### B. Procedural Posture

In December 2020, Plaintiff sued Otsego County, Officer Huff, the City of Gaylord, and nurse Kimberly Reynolds. *See* ECF No. 1. In his initial complaint, Plaintiff alleged Nurse Reynolds worked for OCJ and, for reasons unknown, Plaintiff alleged that she was responsible for denying his medication. *Id.* at PageID.5.

In December 2021, Plaintiff voluntarily dismissed all claims against arresting Officer Huff and his employer, the City of Gaylord, after months of initial discovery revealed they had little to do with the case. ECF No. 29. After additional discovery revealed Nurse Reynolds worked for ACH—not Otsego County or OCJ—Plaintiff sought leave to amend his complaint and add ACH as a Defendant. ECF No. 30. Importantly, Plaintiff's proposed amended complaint alleged ACH, Nurse Reynolds, and Otsego County were jointly and severally liable for his injuries. *Id.* While his motion for leave was pending, Plaintiff submitted a stipulation voluntarily dismissing all claims against Otsego County. *See* ECF No. 36. Curiously, neither Nurse Reynolds nor ACH signed this

stipulation.[2] *See id.* This Court granted Plaintiff leave to amend, ECF No. 37, and he filed his Amended Complaint against Nurse Reynolds and ACH on January 24, 2022. ECF No. 38.

On paper, Plaintiff's claims were straightforward. In Count I, Plaintiff alleged that, by denying his Keppra, Nurse Reynolds was deliberately indifferent to his objectively serious medical need in violation of the Eighth Amendment and 42 U.S.C. § 1983. *Id.* at PageID.436–39. In Count II, Plaintiff alleged ACH was liable for this Eighth Amendment § 1983 violation as a municipality under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *Id.* at PageID.439–46.

But things got complicated during discovery. In February 2022, Defendants filed a motion for summary judgment, ECF No. 45, which, among other points, argued Reynolds was a *licensed practical nurse (LPN)* as opposed to a *nurse practitioner (NP)* such that she was *never* an on-call "mid-level practitioner" assigned to OCJ, and did not receive a call on April 28, 2019. *See id.* Indeed, Nurse Reynolds filed a sworn affidavit that she only worked at OCJ in an "on-site" capacity on Tuesdays and Fridays, and accordingly "never saw or examined" Plaintiff and "did not participate in the alleged decision-making process" regarding his medication when he was confined on Sunday, April 28, 2019. ECF No. 45-3. Attached to this affidavit was a copy of Nurse Reynolds' timesheet, which showed she did not physically work at OCJ the day Plaintiff was

---

[2] This was particularly peculiar because the operative contract between ACH and Otsego County contained identical indemnity provisions. Otsego County agreed to "hold harmless and indemnify ACH (together with its respective employees) against any loss or damage, including reasonable attorneys' fees and other costs of litigation, solely caused or necessitated by the . . . . deliberately indifferent conduct of the COUNTY or its employees[] related to medical treatment or care provided by ACH." ECF No. 45-2 at PageID.516 (emphasis in original). And ACH likewise agreed to "hold harmless and indemnify the COUNTY[] (together with [its] employees) any loss or damage, including reasonable attorneys' fees and other costs of litigation, solely caused or necessitated by the[] deliberately indifferent conduct of ACH or its employees[] related to medical treatment or care provided by ACH." *Id.* (emphasis added).

confined there. *Id.* at PageID.523. But this Court did not dismiss Nurse Reynolds from the case because "at least 10" pieces of evidence "collectively suggest[ed]" she *may* have received a call from OCJ, including deposition testimony that OCJ officers had Reynolds' contact information and historically relied on her to approve inmate medication requests even if she wasn't "on call." *See* ECF No. 101 at PageID.2499–500.

So who was on call? And did this ACH employee—or any other—ever receive a phone call? ACH's deponent and then Vice President, Dr. Jill Bresnahan, testified at her deposition that nurse practitioner Courtney Brinkman was the on-call practitioner assigned to OCJ on April 28, 2019. *See* ECF No. 70-2 at PageID.1447–48. But Defendants produced Brinkman's phone records, which revealed that she never received a call from OCJ while Plaintiff was confined there. *See* ECF No. 70-3. Defendants later produced a "staffing matrix," which identified nurse practitioner Jill Nocerini as ACH's *backup* on-call Practitioner assigned to OCJ on April 28, 2019.[3] ECF No. 87-4. Yet her timesheet showed she never physically visited OCJ that day, *see* ECF No. 141-1 at PageID.3438, and Plaintiff did not depose her or request her phone records to see if she otherwise received a call.[4]

---

[3] Although Defendants' staffing matrix also identified two other ACH "mid-level" practitioners assigned to OCJ, both were scheduled to be "on call" there long after Plaintiff was confined on April 28, 2019. *See* ECF No. 87-4 at PageID.2106. Nurse practitioner Joseph Mashni was the backup on-call practitioner beginning June 28, 2019, and Wilma Kagarise was the primary on-call practitioner beginning July 17, 2019. *Id.* In an abundance of caution, and because deposition testimony suggested OCJ officers would call ACH practitioners at random from a list of provided names in their control room, this Court ordered Defendants to produce Mashni's and Kagarise's timesheets, too. ECF No. 135. The timesheets reflected that neither practitioner physically worked at OCJ on April 28, 2019. *See* ECF No. 141-1 at PageID.3451, 3459 (noting Kagarise was not hired by ACH until 3 months *after* Plaintiff was confined at OCJ).

[4] As explained *supra* Section III.B, Nocerini testified at trial that she does not recall receiving a call from OCJ on April 28, 2019. ECF No. 168 at PageID.4112

Despite discovery, the question remained: did an OCJ officer call Nurse Reynolds—or any other ACH employee—on April 28? This Court worked with the Parties pretrial to properly frame this question in the instructions and verdict form provided to the jury.

### C.  Jury Instructions

Before turning to these pretrial jury instruction discussions, some brief background on the law governing Plaintiff's claims is necessary to understand why proof of a phone call was essential.

### 1.

As explained, Plaintiff alleged both Nurse Reynolds and ACH deprived him of his Eighth Amendment rights in violation of 42 U.S.C. § 1983. *See* ECF No. 38. Specifically, Plaintiff alleged that, by withholding his Keppra, Defendants were deliberately indifferent to his objectively serious medical needs while confined, which violates the Eighth Amendment as a form of cruel and unusual punishment. *Id.* at PageID.436–46. To prevail, Plaintiff needed to satisfy separate "objective and subjective" prongs. *Finley v. Huss*, 102 F.4th 789, 805 (6th Cir. 2024). Objectively, Plaintiff needed to prove his Keppra prescription was a sufficiently serious medical need, and that being confined without it "pos[ed] a substantial risk of serious harm." *Id.* Subjectively, Plaintiff needed to prove that Defendants "(1) knew about facts from which they could infer that a substantial risk existed, (2) drew that inference, and (3) disregarded the risk." *Id.* Critically, a defendant *cannot* be liable for Eighth Amendment deliberate indifference "unless the [defendant] *knows of*" the inmate's serious medical need or health risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *accord Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).

But 42 U.S.C. § 1983 adds additional elements. This statute serves as a vehicle through which individual plaintiffs can seek redress for alleged violations of their federal constitutional rights and provides that any "person who, under the color of [law]," deprives another of their

constitutional rights "shall be liable" for such deprivation. 42 U.S.C. § 1983. So, to succeed on his § 1983 claims, in addition to proving the elements of the underlying constitutional deprivation, Plaintiff also needed to prove that the deprivation was committed by a "person" acting under the "color of [law]." Here, although they are not public officials or entities, all Parties stipulated that ACH and Nurse Reynolds acted under the color of law because "medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of . . . law for the purposes of § 1983." *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018). And, because Nurse Reynolds is undoubtedly a "person," Plaintiff only needed to prove the elements of his underlying Eighth Amendment deprivation to succeed on his § 1983 claim against *her*.

Plaintiff's requisite proofs against *ACH* were more complicated. ACH is an entity, not a "person," as the word is commonly used in conversation. But, in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that municipalities can be treated as "persons" subject to § 1983 liability in certain circumstances. As explained, ACH stands in the shoes of a municipality because, by providing healthcare services to inmates, it performed a "fundamental[] public function." *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008). But municipalities like ACH cannot be liable for § 1983 deprivations merely because they employ an individual who violates § 1983. *Monell*, 326 U.S. at 691. ("[A] municipality cannot be held liable under § 1983 on a respondent superior theory."). And, central to this Opinion and Order, a municipality cannot be liable if their officers commit no constitutional violation in the first place. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 487 (6th Cir. 2017).

Instead, municipalities are only liable under *Monell* for their "official policies" that cause an employee to violate another's constitutional rights. *Monell*, 436 U.S. at 692. Generally, there

are four "avenues a plaintiff may take to prove the existence of a [defendant's] illegal policy or custom. The plaintiff can identify (1) the municipal defendant's legislative enactments or "on-the-books" policies; (2) actions taken by municipal officials with final decision-making authority; (3) the municipality's inadequate training or supervision; or (4) the municipality's custom or pattern of acquiescence in the face of federal constitutional violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But, even when a plaintiff can show one of these four forms of "policies," a plaintiff must also "connect the policy to the municipality" and show that the policy caused the alleged constitutional deprivation. *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 404 (6th Cir. 2010) (emphasis added).

Plaintiff pursued two "avenues" or theories of *Monell* liability against ACH at trial. First, Plaintiff alleged ACH failed to adequately train its employees to respond to inmate medication requests. ECF No. 38 at PageID.439–46. To succeed on his "failure to train" *Monell* theory, Plaintiff needed to prove—in addition to the underlying Eighth Amendment violation—that (1) ACH's training was inadequate for the tasks its employees regularly perform, (2) ACH was deliberately indifferent to this inadequacy, and (3) the inadequacy was closely related to or caused a violation of Plaintiff's Eighth Amendment rights. *See Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). Understandably confusing in Eighth Amendment cases involving inmate healthcare, "deliberate indifference" to inadequate training is an element *separate from* and *in addition to* "deliberate indifference" to an objectively serious medical need that a plaintiff must prove to succeed on their underlying constitutional claim. For *Monell* purposes, a plaintiff can prove the municipality's deliberate indifference to inadequate training either by showing (A) the municipality "had notice that the training was deficient and likely to cause injury but ignored it"

or (B) a "single violation of federal rights, accompanied by a showing that the [municipal defendant] failed to train its employees to handle a recurring situation presenting an obvious potential for such violation." *Id.*

Second, Plaintiff alleged that ACH had a widespread, prevalent custom of withholding inmate medication. ECF No. 38 at PageID.439–46. To succeed on his "custom" *Monell* theory, Plaintiff needed to prove—again in addition to his underlying Eighth Amendment claim—the following four factors: (1) the existence of a clear and persistent pattern of illegal activity; (2) ACH knew about this pattern; (3) ACH tacitly approved this pattern of unconstitutional conduct; and (4) ACH's custom was the "moving force" behind Plaintiff's constitutional deprivation, or "directly caus[ed]" it. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Take a breath. These interwoven standards, often including amorphous elements, are difficult to grasp and even more difficult to distill in common-sense language to explain to a jury.

### 2.

On February 9, 2024, the Parties sent this Court 105 pages of proposed jury instructions.[5] After considering this proposal and other model instructions, this Court sent the Parties the first draft of the jury instructions and verdict form on February 13, 2024.

To succeed on his claim against Nurse Reynolds, the draft instructions required Plaintiff to prove, among other elements, that "on April 28, 2019, [OCJ] staff contacted Ms. Reynolds and told her that [Plaintiff] was epileptic, was prescribed anti-seizure medication, and that Mr. Victor's medication was available to give to him." Otherwise, Nurse Reynolds—who was not present at OCJ while Plaintiff was confined there—could not have been subjectively aware of Plaintiff's

---

[5] Although not filed on the public docket, all draft jury instructions, verdict forms, and correspondence with Counsel regarding these documents—including responses to objections—remain on file with the Court.

medical needs—even if they were objectively serious—and thus could not have possibly been "deliberately indifferent" to them. *See Bishop*, 636 F.3d at 766–77 (noting plaintiff's burden to prove defendant's deliberate indifference and that "unaware" defendants "may not be held liable . . . even if the risk [to the plaintiff's health] was obvious"). Accordingly, relevant to Plaintiff's claim against Nurse Reynolds, the first draft of the verdict form asked the jurors whether Plaintiff "prove[d] by a preponderance of the evidence that [OCJ] staff told Ms. Reynolds about his serious medical need while he was confined at Otsego County Jail on April 28, 2019?" and required the jurors to answer either "yes" or "no."

Relatedly, to succeed on his *Monell* claim against ACH—under either of the two theories Plaintiff pursued—the draft instructions required Plaintiff to prove that "on April 28, 2019, [OCJ] staff contacted an ACH employee and told the employee that Mr. Victor was epileptic, was prescribed anti-seizure medication, and that Mr. Victor's medication was available to give to him." And the draft verdict form prompted the jurors to answer—in separate sections designated for both *Monell* theories—either "yes" or "no" to the question of whether Plaintiff "prov[ed] by a preponderance of the evidence that [OCJ] staff told an ACH employee about his serious medical need while he was confined at Otsego County Jail on April 28, 2019?"

The rationale for these instructions and questions was—and is—straightforward. Plaintiff did not allege, and the pretrial record did not show, that any ACH practitioner or employee was *physically* present at OCJ when Plaintiff was confined there. So, absent a telephone call from OCJ, no ACH employee could have known about Plaintiff's medical need—let alone been deliberately indifferent to it. *Bishop*, 636 F.3d 757, 766 (6th Cir. 2011). And, absent an underlying constitutional violation by any ACH employee, ACH cannot be liable as a municipality under *Monell*. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality

or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers."); *Roell*, 870 F.3d at 487 (same); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("Neither *Monell* . . . nor any of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual []officer," municipal liability will not lie.)

Neither ACH nor Nurse Reynolds objected to these specific instructions and verdict form questions. Although Plaintiff proposed a new set of substantive instructions on § 1983 and *Monell* liability, Plaintiff agreed the Court's first draft correctly "state[d] the law." Moreover, Plaintiff's proposed instructions were substantively similar to this Court's draft and recognized Plaintiff's burden to prove that a call was made. For example, regarding his individual claim against Nurse Reynolds, Plaintiff's proposal instructed the jury that he must prove "[t]hat Kimberly Reynolds was aware of [his] serious need for medical care." And, for both theories of *Monell* liability against ACH, Plaintiff's proposal instructed that the jury could only hold ACH liable if it concluded that one of "its agents" deprived Plaintiff of his Eighth Amendment rights.

Confusingly, despite recognizing that ACH could not be liable absent an underlying constitutional deprivation committed by one of "its agents," Plaintiff objected to the verdict form insofar as it required the jurors to answer whether Plaintiff proved a call was made for *Monell* liability. Specifically, Plaintiff objected that "pursuant to *Stewart v. Warren County Board of Commissioners*, 821 Fed. Appx. 564, n. 4 (6th Cir. 2020) [and] *North v. Cuyahoga County*, 754 F. App'x 380, 389 (6th Cir. 2018)[], an entity *could* be liable for constitutional violations even where their employees themselves did not violate the plaintiff's rights because it was the policies

themselves that occasioned the harm." This Court overruled Plaintiff's objection off the record,

*see supra* n. 5, explaining:

> As a threshold matter, it is well-settled that *Monell* liability will not lie absent a constitutional violation. *See North v. Cuyahoga Cnty.,* 754 F. App'x 380, 389 (6th Cir. 2018) ("There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails."). In many § 1983 cases, a plaintiff attempts to hold both the individual and their municipal-employer liable for the alleged deprivation of the plaintiff's constitutional rights. And in a vast majority of these cases, if the plaintiff cannot show that the individual defendant—or any individual—deprived his constitutional rights, the municipality will not be liable, either. *Id.* at 390 ("In many cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also mean that the plaintiff has suffered no constitutional violation."). However, in 2018, the Sixth Circuit clarified that, "in certain unusual circumstances, a municipality might by liable for a constitutional violation even in the absence of a liable individual." *Hart v. Hillsdale Cnty.*, 973 F.3d 627, 645 (6th Cir. 2020) (*citing North*, 754 F. App'x at 390)).

> But this case does not present such "unusual circumstance." True, the Sixth Circuit has held that a municipality *may* be liable under a failure-to-train or custom theory *of Monell* liability in the absence of an individual's deliberate indifference. *See, e.g.*, *Grote v. Kenton Cnty.*, 85 F.4th 397, 414 (6th Cir. 2023); *Stewart v. Warren Cnty. Bd. of Commissioners,* 821 F. App'x 564, 572 n. 4 (6th Cir. 2020). But in *North*, and in every other Sixth Circuit case addressing the issue since, there was no dispute that the municipal-defendant's employees were at least somewhat involved in the medical care of the inmate-plaintiff, or were aware of the plaintiff and their alleged medical need, such that the municipality's custom or training would be implicated. *See, e.g.*, *North,* 754 F. App'x at 390 (county sued when county nurse examined plaintiff and ordered blood tests which never occurred); *Grote,* 85 F.4th 397 (6th Cir. 2023) (private healthcare practitioner examined inmate-plaintiff and instructed jail officers to conduct periodic check-ins, which they did not do); *Griffith v. Franklin Cnty.*, 975 F.3d 554, 561 (6th Cir. 2020) (plaintiff was examined by a medical professional who worked for the municipal-defendant contracted by the county to provide inmate healthcare); *Stewart v. Warren Cnty. Bd. of Commissioners* 821 F. App'x 564, 568 (6th Cir. 2020) (medical professionals who worked for private company contracted by county to provide mental health services to inmates met with deceased multiple times before he committed suicide and his estate sued the company and county).

> But, here, there is a genuine dispute as to whether *any* ACH employee was *ever* called by OCJ personnel regarding Plaintiff and his alleged serious medical need. As a matter of common sense, ACH cannot train its employees on how to properly handle inmate requests for medication which they never receive. For example, in *Grote v. Kenton County*, the Sixth Circuit noted "when the constitutional harm

- 13 -

complained of relates to *lack of action due to a failure to train,* the municipality may still be liable" even when no individual acted unconstitutionally. Here, if no ACH employee ever received a call, their "lack of action" regarding Plaintiff's medication cannot logically be attributed to any failure on ACH's behalf. If no ACH employee was ever informed of Plaintiff's request for medication, no training nor custom can be said to have caused a constitutional injury.

Judge Cole's concurrence in *Epps v. Lauderdale County,* 45 F. App'x 332 (6th Cir. 2002)—cited in *North* as providing authority for the theory that a municipality be liable absent individual liability—further illustrates the point. Judge Cole's concurrence discussed only three situations in which municipal liability would be proper absent any individual's constitutional violation: (1) when an employee in good faith follows a faulty municipal policy; (2) when an employee has been exonerated; and (3) when the combined acts or omissions of several employees violate a plaintiff's constitutional rights, even though no one act or omission is itself violative. *Epps v. Lauderdale Cnty.,* 45 F. App'x 332, 335 (6th Cir. 2002) (Cole, J. concurring). The latter two situations do not apply to this case. And the first *only* applies *if* Plaintiff can prove that an ACH employee actually acted in accordance with an ACH custom or training. If no ACH employee was ever called, no ACH employee put an ACH custom or training into practice. Thus, to succeed on his *Monell* claim—under either a failure-to-train or custom theory, Plaintiff *must* establish that an ACH employee was called about Plaintiff and his medical need, yet was deliberately indifferent to it. Indeed, Plaintiff's counsel conceded this point at the February 14, 2024 final pretrial conference.

On March 8, 2024, after resolving and responding to all objections and proposed additions, this Court sent Counsel for both Parties a finalized version of the jury instructions and verdict form. Both required Plaintiff to prove that someone from OCJ called someone from ACH to succeed on his *Monell* claim.

### D.  Trial

Trial began on March 12, 2024 with juror selection and opening statements. Witness testimony began on the morning of March 13, 2024. *See* ECF No. 167 at PageID.3917–18. Plaintiff called the following 14 witnesses:

1. Mary Curran, Plaintiff's mother, *id.* at PageID.3951–78;
2. Zachary Corby, Plaintiff's friend, *id.* at PageID.3979–4008;
3. OCJ Corrections Officer Joe Sullivan, *id.* at PageID.4009–42;
4. Plaintiff Michael Victor, *id.* at PageID.4043–95;

5. Back-up On-Call Nurse Practitioner Jill Nocerini, ECF No. 168 at PageID.4100–23;

6. Arresting Officer Blake Huff, *id.* at PageID.4124–27;

7. OCJ Corrections Officer Tony Tallent, *id.* at PageID.4128–43;

8. OCJ Administrator Brian Webber, *id.* at PageID.4144–72;

9. OCJ Corrections Officer Scott Musall, *id.* at PageID.4173–85;

10. Former ACH Vice President Jill Bresnahan,[6] *id.* at PageID.4186–209;

11. OCJ Corrections Officer Trey Leach, *id.* at PageID.4210–19;

12. Defendant Nurse Karen Reynolds, *id.* at PageID.4220–36;

13. Dr. Michael Cusatis, Plaintiff's surgeon,[7] *id.* at PageID.4236–64; ECF No. 170 at PageID.4378–80.

14. Dr. Cornelius Robens, Plaintiff's neurologist,[8] ECF No. 170 at PageID.4385–36.

After four days of proofs, Plaintiff rested. ECF No. 170 at PageID.4390. Defendants did not call any witnesses and instead made a verbal motion for judgment as a matter of law under Civil Rule 50(a).[9] *See* ECF No. 170 at PageID.4391. Defendants argued that Plaintiff failed to prove the "lynchpin" of his claims because no OCJ witness testified to calling or otherwise contacting any ACH employee while Plaintiff was confined, and no ACH employee testified to receiving a call from OCJ. *Id.* at PageID.4391–92. After receiving Plaintiff's response, Defendants' motion was taken under advisement. *Id.* at PageID.4397; *see also* FED. R. CIV. P. 50(b).

After about eight hours of deliberation across two days, the jury reached a verdict on March 19, 2024. ECF No. 165 at PageID.3914. The jury found for Nurse Reynolds on Count I. *Id.* at PageID.3905. Although the Jury found that Plaintiff's Keppra prescription was an objectively

---

[6] Dr. Bresnahan testified remotely over Zoom. *See* ECF No. 168 at PageID.4185.

[7] Dr. Cusatis provided a *de bene esse* deposition, which was read and played into the record instead of live trial testimony.

[8] Dr. Robens recorded a *de bene esse* deposition, which was played into the record instead of live trial testimony.

[9] Defense Counsel sought a "directed verdict." ECF No. 170 at PageID.4391. But this "old term" has been "amalgamate[d]" by Civil Rule 50, which uses the term "judgment as a matter of law." *Hanover Am. Ins. Co. v. Tattooed Millionaire Entertainment, LLC*, 974 F.3d 767, 779 (6th Cir. 2020).

serious medical need, it concluded that Plaintiff did *not* prove by a preponderance of the evidence

that Nurse Reynolds was contacted by OCJ or otherwise knew about Plaintiff's medical need. *Id.*

But the jury did find for Plaintiff on Count II, his *Monell* claim against ACH. Importantly,

the jury did not hold ACH liable under a "failure to train" theory of *Monell* liability. *Id.* at

PageID.3910. Instead, the jury found for Plaintiff on his "custom" theory, concluding Plaintiff

proved the following by a preponderance of the evidence:

1. Plaintiff had an "objectively serious medical need while confined at OCJ on April 28, 2019,"
2. An OCJ officer "told an ACH employee about his serious medical need while he was confined [there] on April 28, 2019,"
3. "A[n] ACH employee consciously failed to take reasonable measures to treat Plaintiff's serious medical need,"
4. Plaintiff "was harmed as a result of an ACH employee's conscious disregard of his serious medical need,"
5. "ACH had a persistent and widespread custom or practice of withholding inmate medication," and
6. "ACH's custom or practice of withholding inmate medication caused an ACH employee to consciously disregard [Plaintiff's] medical need[.]"

*Id.* at PageID.3907–08.

The jury awarded Plaintiff $20,000 in economic damages, $50,000 in noneconomic

damages, and $700,000 in punitive damages. ECF No. 165 at PageID.3911–13.

After trial, Plaintiff filed a motion seeking over $360,000 in attorney's fees, ECF No. 173.

Defendant ACH renewed its motion for judgment as a matter of law, ECF No. 175, and filed

alternative motions for a new trial, ECF No. 180, or an altered or amended judgment, ECF No.

181. As explained below, ACH is entitled to judgment as a matter of law, ACH's motion for a new

trial will be conditionally granted, and all other motions are moot.

## II.

In federal question cases, judgment as a matter of law under Civil Rule 50 may be granted

"only where 'a party has been fully heard on an issue and there is no legally sufficient evidentiary

basis for a reasonable jury to find for that party on that issue.'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). This relief is rare. Jury verdicts are afforded "substantial deference," *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007), and reviewing courts cannot weigh contradicting witness testimony or question witness credibility. *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). Instead, "the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences." *Id.*

However, judgment as a matter of law is appropriate if "reasonable minds could not come to a conclusion other than one favoring the movant," *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir.2005), or if the evidence "is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *Wilson v. Schlumberger Tech. Corp.*, 80 F.4th 1170, 1180 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 2630 (2024). Indeed, "[a]lthough judgment as a matter of law should be granted sparingly, a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion." *Goodman v. Pennsylvania Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002); *accord Frazier v. CSX Transp., Inc.*, 156 F.3d 1229 (6th Cir. 1998) ("A plaintiff must present more than a scintilla of evidence to withstand a motion for judgment as a matter of law.").

## III.

The sole issue is clear: did Plaintiff provide sufficient evidence for a reasonable jury to conclude that an OCJ officer contacted an ACH employee while Plaintiff was confined on April 28, 2019?[10] The answer is just as clear: he did not.

Five of Plaintiff's 14 witnesses—his mother, Mary Curran; his friend Zach Corby; his surgeon, Dr. Cusatis; his prescribing physician, Dr. Robens; and former ACH Vice President Jill Bresnahan—had no personal knowledge of what occurred while Plaintiff was confined at OCJ on April 28, 2019, and provided no testimony even remotely supporting Plaintiff's requisite proof that a call was made. *See generally* ECF Nos. 167 at PageID.3951–76, 3979–4008; 168 at PageID.4186–210, 4236–64; 170 at PageID.4378–80, 4385–36. The remaining nine witnesses can be grouped into three categories: (1) OCJ and other law enforcement officers; (2) ACH nurses and practitioners; and (3) Plaintiff himself. The evidence presented by the witnesses in each category— and the sufficiency of this evidence—will be discussed in turn.

### A. Arresting and OCJ Officer Testimony

Neither arresting officer Blake Huff nor any OCJ corrections officer testified that a call was placed to ACH while Plaintiff was confined. Arresting Officer Huff testified that Plaintiff's mother gave him Plaintiff's medication, and that he then gave the medication to OCJ Corrections Officer Trey Leach. ECF No. 168 at PageID.4125. But Huff testified that, after handing the medication to Leach, he "ha[d] [no] interaction with anyone" at OCJ or ACH while Plaintiff was confined. *Id.* at PageID.4126. Indeed, Huff testified that it was not "[his] job to call ACH to get

---

[10] As explained, Plaintiff argued pretrial that his case involved "unusual circumstances" that would allow *Monell* liability against ACH *without* proof that any individual ACH employee violated his Constitutional rights. *See supra* Section I.C.2. But this Court already rejected that argument as meritless, *id.*, and Plaintiff did not re-raise the issue in response to ACH's motion for judgment as a matter of law. *See* ECF No. 184 at PageID.5024, n. 1 (preserving the argument for appeal).

approval for medicine" because this responsibility "falls on [OCJ's] *corrections* staff." *Id.* (emphasis added).

All four corrections officers who worked at OCJ while Plaintiff was confined there on April 28, 2019, testified at trial. None testified that they—or any other OCJ officer—called ACH. Corrections Officers Trey Leach and Tony Tallent were working at OCJ when Plaintiff was arrested. *See* ECF No. 168 at PageID.4129. Officer Leach testified that he did not remember receiving Plaintiff's medication, let alone calling ACH while Plaintiff was confined. *Id.* at PageID.4212–13, 4216. And Officer Tallent testified that he "had no involvement with any medications concerning [Plaintiff]" and "didn't make any phone calls to anyone from ACH" while Plaintiff was confined. *Id.* at PageID.4141. Later in the evening, Officers Leach and Tallent were relieved by OCJ Corrections Officers Joe Sullivan and Scott Musall. *See id.* at PageID.4174. But Officer Sullivan testified that he "do[es]n't remember reaching out to anyone" while Plaintiff was confined, and does not recall Plaintiff's medication ever being dropped off at OCJ. ECF No. 167 at PageID.4021–22. And Officer Musall testified that, to his knowledge, no OCJ employee called ACH about Plaintiff's medication "on [his] shift." ECF No. 168 at PageID.4184

Plaintiff also called OCJ Administrator Brian Webber, who conducted an internal investigation to determine if any OCJ officer called an ACH employee while Plaintiff was confined.[11] *See* ECF No. 168 at PageID.4160–64.Webber testified, on multiple occasions, that his investigation concluded that ACH was never called:

> **Defense Counsel:** Now . . . did you conduct an investigation to determine if [someone called ACH]?
> **Webber:** I reviewed every bit of documentation that we could—or that I could.
> **Defense Counsel:** Did you find anywhere in the documentation that you reviewed that [an officer prepared] an illness report [concerning Plaintiff's medication]?

---

[11] It is unclear whether OCJ Administrator Webber conducted this internal investigation before or after Otsego County was dismissed from the above-captioned case after settling with Plaintiff.

**Webber:** I did not find such report.

**Defense Counsel:** Now, jails operate pretty much on logs that document what movement of inmates take place?

**Webber:** Yes.

**Defense Counsel:** What interactions that inmates might have, did an inmate get sick, did an inmate request medical, did an inmate fall down, did they get in a fight, all of those things are maintained in a log?

**Webber:** Yes, sir.

. . .

**Defense Counsel:** Did you find a log in this case that an ACH person was called regarding Mr. Victor and his issues relating to wanting medication?

**Webber:** No.

. . .

**Defense Counsel**: Okay, one of the things you investigated was whether an on-call provider was called, correct?

**Webber:** Correct.

**Defense Counsel:** Do you believe you did a thorough investigation to determine if an on-call provider was called?

**Webber:** Yes.

**Defense Counsel:** Did you determine whether an on-call provider was called or not called?

**Webber**: I determined they were not called.

*See id.*

Despite this, Plaintiff argues that the OCJ officers' testimony provides a sufficient evidentiary basis for the jury to conclude that at least one of them called ACH because many testified that they did not "remember" or "recall" contacting ACH, so the call *could* have occurred. *See* ECF No. 184 at PageID.5027 ("[N]one of the officers testified that they were certain that they did not call ACH[.]"). This argument is misplaced. As the Sixth Circuit and this Court routinely recognize, testimony that something may have occurred *creates* a factual question but does nothing to *resolve* it. *See, e.g.*, *Pratt v. Brown Mach. Co., a Div. of John Brown*, 855 F.2d 1225, 1233 (6th Cir. 1988) (finding witness testimony that an event "may have" occurred "insufficient to raise an issue of fact" as to whether the event actually occurred); *Gardner v. Flagstar Bank, N.A.*, No. 20-12061, 2024 WL 1641223, at *5 (E.D. Mich. Apr. 16, 2024) (noting witness testimony that she

"d[id]n't remember" a fact  "does not affirmatively demonstrate" that the fact occurred). Plaintiff had to *resolve* the factual question of whether ACH was called on April 28, 2019 in his favor. No OCJ officer provided any evidence to help him do so.

On this point, Plaintiff repeatedly cites testimony that various OCJ officers had Nurse Reynolds's cell phone number, and her number—along with the phone numbers of other ACH practitioners—was located on a list in the jail. ECF No. 184 at PageID.5020, 5035. And? Evidence that one knows of another's phone number, without more,  does not suggest they picked up a phone and dialed the number on a particular occasion. Similarly, Plaintiff points to Officer Sullivan's testimony that the officers "would" usually contact ACH practitioners if a medical issue occurred after hours. ECF No. 184 at PageID.5018–19, 5029 (citing ECF No 167 at PageID.4013–14, 4038). But there is a difference between "would" and "did." Without more, this speculative statement does not provide a legally sufficient basis for a jury to infer that an OCJ officer called ACH while Plaintiff was confined on April 28, 2019. *See Lakeside-Scott v. Multnomah Cnty*., 556 F.3d 797, 808 (9th Cir. 2009) (granting judgment as a matter of law where necessary inference "would be pure speculation"); *Genthe v. Lincoln*, 383 F.3d 713, 718 (8th Cir. 2004) (noting that inferences are only reasonable when they "may be drawn from the evidence without resort to speculation"); *Barnes v. Arden Mayfair, Inc*., 759 F.2d 676, 680 (9th Cir. 1985) (noting "threadbare conclusory statements" cannot support inference jury relied on to reach a verdict).

At bottom, although Plaintiff called six law enforcement officers throughout his case in chief, no one testified that they—or any other officer—ever called ACH while Plaintiff was confined on April 28, 2019.

**B. ACH Employee Testimony**

Similarly, although Plaintiff called two ACH employees as witnesses, neither testified that they—or any other ACH employee—ever received a call from OCJ while Plaintiff was confined there. ACH Nurse Practitioners Courtney Brinkman and Jill Nocerini were "on call" at OCJ on the morning of April 28, 2019. Plaintiff did not call Brinkman as a witness, likely because her phone records produced throughout discovery reflected that she never received a call from OCJ while Plaintiff was confined.[12] *See* ECF No. 70-3. Nocerini testified that she "ha[d] no recollection" of receiving a call from OCJ that day.[13] ECF No. 168 at PageID.4112. And although Officer Leach testified that, on prior unspecified occasions, he would call Nurse Reynolds for help with "medical issue[s]" even if she wasn't "on call,"[14] *see id.* at PageID.4215, Nurse Reynolds testified she was never on call at ACH, generally, and accordingly did not testify that she received a call on April 29, 2019, specifically. *Id.* at PageID.4229.

Let's review the record. None of the six officers who testified at trial—including all four officers who worked at OCJ the morning Plaintiff was confined, OCJ's Administrator, and Plaintiff's arresting officer—testified that they, or any other officer, called ACH regarding

---

[12] Although Plaintiff did not call Brinkman as a witness and produced no evidence about her whatsoever, Plaintiff's Counsel conceded in closing arguments that "Brinkman . . . [was] also on call and [OCJ] didn't even call her." ECF No. 172 at PageID.4488.

[13] Plaintiff again argues that, because Nocerini "could not confirm or deny" whether she was called while Plaintiff was confined, the jury could reasonably infer a call was made. ECF No. 184 at PageID.5018, 5022 (noting this testimony "demonstrates evidence from which the Jury could have" concluded a call was made). As explained *supra* Section III.A, this argument lacks merit because testimony that a witness does not remember an event does nothing to prove the event occurred.

[14] Notably, contrary to Officer Sullivan's testimony, many other OCJ officers testified that they would *not* contact Reynolds for inmate medication approval. *See* ECF Nos. 167 at PageID.4036 (Officer Sullivan explaining he "d[id]n't think" OCJ officers would reach out to Reynolds about medical issues when she wasn't at the jail); 168 at PageID.4131 (Officer Tallent explaining OCJ officers would *not* call Nurse Reynolds for medication approval and "would call a doctor," instead).

Plaintiff's medication. And neither of the two ACH employees who testified at trial—Nurse Reynolds and Nurse Practitioner Nocerini—testified that they or any other ACH employee ever received a call from OCJ on the morning of April 28, 2019. The *only* remaining witness is Plaintiff himself.

### C. Plaintiff's Testimony

Plaintiff points to two parts of his trial testimony, which he contends form a legally sufficient basis upon which a reasonable jury could conclude a call was made. ECF No. 184 at PageID.5019 (citing ECF No. 167 at PageID.4058, 4060). Neither do.

#### a.

First, Plaintiff testified that, while he was confined at OCJ, he had a conversation with an unidentified officer, which left him with the "understanding that a nurse was reached out to and that [he] could not have [his] meds[.]" ECF No. 167 at 4060. But this testimony was inadmissible.

Pretrial, this Court granted ACH's motion in *limine* and expressly held that "Plaintiff cannot testify" that an OCJ officer[15] "told him he could not have his medication *because* the 'nurse did not okay it.'" ECF No. 145 at PageID.3501 (emphasis in original). This Court reasoned that this statement is inadmissible hearsay-within-hearsay with no applicable exception. *Id.* (citing FED. R. EVID. 805, 803(4)). At trial, Plaintiff's Counsel tried to circumvent this evidentiary ruling by asking Plaintiff to provide his "understanding" from his conversation with the unidentified officer, without testifying who the officer was or what the officer said. *See* ECF No. 167 at PageID.4059 ("Without telling me what the officers told you, did you have an understanding that the officers had talked to the nurse? And what was your understanding?"), PageID.4060 ("And don't tell me

---

[15] At his deposition, Plaintiff testified that OCJ corrections officer Joe Sullivan made this statement. ECF No. 45-11 at PageID.610–11. But, at trial, Plaintiff could not remember "if it was Sullivan" or another OCJ officer. ECF No. 167 at PageID.4057.

what Officer Sullivan said to you, but was it your understanding based on that conversation that you could not have the medication?"). This Court overruled Defense Counsel's objection to the *question* about whether Plaintiff was under the impression that he "could not have his medicine" while confined. *Id.* at PageID.4060. A yes or no answer to that question would have been admissible. But Plaintiff's *answer*—that he "was under the understanding that a nurse was reached out to and [he] could not have [his] meds because [he] had alcohol in his system"—effectively regurgitated the very inadmissible hearsay-within-hearsay this Court expressly excluded.

Accordingly, this inadmissible testimony cannot be considered in opposition to ACH's motion for judgment as a matter of law. *See Weisgram v. Marley Co.*, 528 U.S. 440, 442, (2000) ("Inadmissible evidence contributes nothing to a legally sufficient evidentiary basis" to sustain a jury verdict.); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 280 (4th Cir. 2021) (noting inadmissible evidence must be "excised" from Rule 50 review); *Taxinet Corp. v. Leon*, 114 F.4th 1212, 1224 (11th Cir. 2024) (noting, "in light of *Weisgram*," "[t]he Rule 50 question . . . is whether all of the *properly* admitted evidence" supported the jury's verdict (emphasis in original)).

**b.**

Second, Plaintiff points to his own testimony that, while he was confined at OCJ, an unknown officer told him that he *would* reach out to an ACH employee regarding Plaintiff's medication.[16] ECF No. 184 at PageID.5019 (citing ECF No. 167 at PageID.4058). Unlike the inadmissible hearsay-within-hearsay discussed above, this Court expressly held pretrial that this "forward-looking" statement concerning the officer-declarant's "then existing intent or plan" was

---

[16] Initially, Plaintiff testified that "a couple of officers" told him that "*they* were going to reach out to a nurse to see if [he] could take [his] meds." ECF No. 167 at PageID.4056 (emphasis added). But Plaintiff later testified that only *one* OCJ officer said that only *he* would "okay [Plaintiff's medication] with the nurse." *Id.* at PageID.4058.

admissible as an exception to hearsay under Federal Rule of Evidence 803(3). ECF No. 145 at PageID.3500; *see also* ECF No. 167 at PageID.4056. And, under the "*Hillmon* doctrine," it is well-settled that this admissible statement of the officer-declarant's intent can be considered to show "that the officer not only planned to call [an ACH nurse], but that he carried out the plan," too. *Victor v. Reynolds*, 649 F. Supp. 3d 499, 523 (E.D. Mich.), *reconsideration denied*, 678 F. Supp. 3d 940 (E.D. Mich. 2023).

The *Hillmon* doctrine derives from the Supreme Court's decision in *Mutual Life Ins. Co. of N.Y. v. Hillmon,* 145 U.S. 285, (1892). In *Hillmon,* the plaintiff, Sallie Hillmon, sued various insurance companies to recover from her husband John Hillmon's life insurance policies. *Id.* at 285. Mrs. Hillmon alleged that John died on March 17, 1879, at a place called Crooked Creek in Kansas. *Id.* at 286–87. But the insurance companies contended John was "alive and hiding" and that the Hillmons falsely reported his death using the body of another man, Frederick Walters, who was reported missing at the time. *Id.* at 286. At trial, there was "much conflicting evidence" about whether the body was John's or Frederick's, including "photographs and descriptions of the corpse, and of the marks and scars upon it, and testimony to its likeness to Hillmon and Walters." *Id.* at 287. To support their contention, the insurance companies sought to introduce letters from Frederick to his sister and fiancée, in which he stated his intention to travel with Hillmon in search of a cattle ranch. *See id.* at 287–89. The trial court excluded these letters as inadmissible hearsay. *Id.* at 287.

But the Supreme Court reversed, explaining that "[a] man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written." *Id.* at 295. So when otherwise relevant, a statement of future intention "may be proved

by contemporaneous oral or written declarations of the party." *Id.* Addressing the historical basis

of the hearsay rule, the Court reasoned:

> The existence of a particular intention in a certain person at a certain time being a
> material fact to be proved, evidence that he expressed that intention at that time is
> as direct evidence of the fact as his own testimony that he then had that intention
> would be. After his death there can hardly be any other way of proving it, and while
> he is still alive his own memory of his state of mind at a former time is no more
> likely to be clear and true than a bystander's recollection of what he then said, and
> is less trustworthy than letters written by him at the very time and under
> circumstances precluding a suspicion of misrepresentation.

*Id.* Thus, the Court concluded that the letters were "competent" evidence to show that, shortly

before Frederick traveled from Wichita, "he had the intention of going, and of going with [John]

Hillmon, which made it more probable both that he did go and that he went with Hillmon than if

there had been no proof of such intention." *Id.* at 296. In other words, under the *Hillmon* doctrine,

statements of intent are admissible and probative of the declarant's future conduct.[17]

But this probative value only stretches so far. In *Hillmon* itself, although the Supreme Court

concluded statements of intent make it somewhat "more *probable*" that the future conduct

occurred, the Court also held that statements of intent to engage in future conduct, without more,

do not *prove* the future conduct actually occurred. *Id.* at 295 (emphasis added) (noting the "letters

in question were competent not . . . as proof that [Walters] actually went away" with Hillmon).

Here, Plaintiff presented no evidence which even circumstantially suggests the unidentified OCJ

officer's intent to call ACH was ever carried out. Plainly, this single statement of intent by an

---

[17] Since *Hillmon*, Congress and the courts have disagreed about whether a declarant's statements of intent are also probative of *non-declarant's* future conduct. *See Coy v. Renico*, 414 F. Supp. 2d 744, 769 (E.D. Mich. 2006) (explaining circuit split); *compare* FED. R. EVID. 803(3), 1972 advisory committee note (explaining that *Hillmon* is "undisturbed" as applied to both declarants and non-declarants) *with* H.R. REP. NO. 93-650, at 13–14 (1973) (limiting *Hillmon* doctrine in adoption of Rule 803(3) such that "statements of intent by a declarant [are] admissible only to prove his future conduct, not the future conduct of another person").

unidentified officer is the *only* admissible evidence Plaintiff presented from 14 witnesses throughout four days of proofs in support of the fact that someone from OCJ called someone from ACH while Plaintiff was confined on April 28, 2019. Without more, this grain of sand is not enough for a reasonable jury to rationally conclude that a call was actually made. *See Frazier*, 156 F.3d 1229 ("A plaintiff must present more than a scintilla of evidence to withstand a motion for judgment as a matter of law."); *Wilson*, 80 F.4th at 1180 ("Judgement as a matter of law is appropriate only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." (internal quotations omitted)).

For these reasons, Defendant ACH's motion for judgment as a matter of law, ECF No. 175, will be granted. Because Plaintiff did not prove that any ACH employee knew about—let alone was deliberately indifferent to—his objectively serious medical needs, this Court will enter judgment in favor of ACH on Count II, Plaintiff's *Monell* claim. ACH's motion for an altered or amended judgment, ECF No. 181, and Plaintiff's motion for attorney's fees and costs, ECF No. 173, will accordingly be denied as moot.

## IV.

But this Court must also conditionally address Defendant ACH's motion for a new trial, ECF No. 180. Under Civil Rule 50(c)(1), when a district court grants a motion for judgment as a matter of law, "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." FED. R. CIV. P. 50(c)(1); *accord Crankpark, Inc. v. Rogers Group, Inc*., 821 F. 3d 723, 737 (6th Cir. 2016). For the reasons that follow, Defendant's motion for a new trial will be conditionally granted.

Civil Rule 59 authorizes courts to "grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).

The Sixth Circuit has interpreted this cyclical rule to permit a new trial "when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996).

Two of these three reasons justify a conditional new trial in this case. First, as explained, the jury's verdict was against the great weight of the evidence.[18] *See supra* Section III (explaining,

---

[18] Why, then, did the jury find for Plaintiff against ACH? Two reasons are readily apparent. First, Plaintiff's injuries were undisputably significant and serious. The jury saw graphic photographs of Plaintiff's injuries and heard lengthy testimony about his pain, suffering, and strenuous recovery. *See, e.g.*, ECF No. 167 at PageID.4066–67. Second, Plaintiff admitted a "Loss Run Report," which contained over 100 pages of documented internal inmate complaints of inadequate healthcare ACH received across hundreds of correctional institutions throughout the Midwest since 2018. ECF No. 124-2. In a pretrial ruling, this Court held that the Loss Run Report was *not* inadmissible character evidence under Federal Rule 404(b) because it had a permissible non-propensity purpose: whether ACH knew of or was on notice of a pattern of unconstitutional conduct. ECF No. 145 at PageID.3503 (noting both theories of Plaintiff's *Monell* claim against ACH "demand[ed] this evidence"). And this Court denied Defendants' motion *in limine* to exclude this evidence under Rule 403 grounds because, pretrial, Defendants had not shown the unfair prejudicial value of this Report substantially outweighed its permissible non-propensity purpose. *Id.* at PageID.3505. ACH could have asked for a limiting instruction to minimize the prejudicial effect of this Report and explain its limited non-propensity purpose. *See United States v. White*, 543 F. App'x 563, 569 (6th Cir. 2013). It did not. ACH could have called a witness to explain the Loss Run Report. It did not. ACH could have objected to the Loss Run Report at trial. It did not. Indeed, when this Court denied Defendants' motion *in limine* to exclude the Loss Run Report, it explained that "the denial . . ‘does not necessarily mean that the court will admit the evidence at trial.'" ECF No. 145 at PageID.3485 (quoting *United States v. Phillips*, 146 F. Supp. 3d 837, 841 (E.D. Mich. 2015), *aff'd in part*, 677 F. App'x 294 (6th Cir. 2017)). Instead, the jury received the 106-page Loss Run Report in its entirety and was free to read the entries alleging ACH killed inmates, deprived them of medication, and ignored complaints of medical concerns. This Court is not suggesting this Loss Run Report was inadmissible. Indeed, this was the primary—if not only—evidence supporting the jury's conclusion that Plaintiff proved ACH had a persistent and widespread custom or practice of withholding inmate medication, *see* ECF No. 165 at PageID.3908. But, as explained, this was only one-third of Plaintiff's *Monell* battle. He also had to prove (1) that an ACH employee was deliberately indifferent to his medical needs on April 28, 2019, and (2) that ACH's custom *caused* this deprivation. Without proof that a call was ever made to ACH while Plaintiff was confined, Plaintiff proved neither. And the jury may have disregarded this lack of proof in light of the prejudicial Loss Run Report.

on one hand, Plaintiff presented a single statement of intent that an ACH officer would call OCJ but, on the other hand, no OCJ officer testified that they or any other person called ACH and no ACH employee testified to receiving a call). Second, the jury's $700,000 punitive damages award was excessive.

Notably, ACH does not argue that the jury awarded excessive *compensatory* damages. *See* ECF No. 180. Nor could it. Compensatory awards cannot be overturned unless they are "beyond the maximum damages that the jury reasonably could find to" compensate for the plaintiff's loss. *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994). Here, the jury's $20,000 economic damages award was supported by the undisputed testimony that Plaintiff's injury cost him $13,654.43 in medical bills and $1,210 in lost wages and may require additional correctional care in the future. *See* ECF Nos. 167 at PageID.4079 (noting parts of Plaintiff's jaw were "still fractured" such that he may need "to get it fixed"); 168 at PageID.4250 (noting Plaintiff's jaw "is never going to be normal again"); 172 at PageID.4470. Similarly, the jury's $50,000 noneconomic damages award was reasonably supported by significant testimony that Plaintiff suffered severe physical pain, mental anguish, depression, anxiety, and embarrassment as a result of his injury. *See, e.g.*, ECF No. 167 at PageID.4064 (describing his injury as "the worst pain [Plaintiff] ever experienced," noting Plaintiff took ibuprofen instead of opioids to mitigate pain), PageID.4067 ("I would struggle with [eating] and it was painful. I would try to open my mouth as much as possible, but [the wiring caused] more pain on my mouth, so it was messy. . . . There were times I would push away my plate because I was just so upset that I couldn't eat my food. I'd lose my appetite . . . [t]here were times I was crying about it."), PageID.4078 ("I mean, I was in pain, it hurt to talk . . .and I was embarrassed. I mean, if I went out, people [would] see my face swollen, ask me what happened and I didn't want to tell the story.")

But punitive damages are subject to different standards of review. Fifth Amendment due process "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *see also Williams v. First Advantage LNS Screening Sols. Inc*., 947 F.3d 735, 750 n.12 (11th Cir. 2020) (noting that although the Supreme Court has only explicitly considered whether the Fourteenth Amendment's Due Process Clause restricts penalties imposed by a State, the same principle under the Fifth Amendment's Due Process Clause restricts penalties imposed in the context of a federal cause of action); *EEOC v. Fed. Express Corp*., 513 F.3d 360, 376 (4th Cir. 2008) ("A punitive damages award is subject to review for compliance with the procedural and substantive constitutional limitations of the Due Process Clause of the Fifth Amendment[.]"). "Due process thus requires that before a punitive damages award may issue, one must have received 'fair notice' both of what conduct is prohibited as well as 'the severity of the penalty that a State may impose' when a person commits the prohibited conduct." *Kidis v. Reid*, 976 F.3d 708, 715 (6th Cir. 2020) (quoting *State Farm*, 538 U.S. at 417). "Otherwise, the award 'furthers no legitimate purpose' and 'constitutes an arbitrary deprivation of property.'" *Id.* (quoting *State Farm*, 538 U.S. at 417). The Supreme Court has set the following three "guideposts" for courts to consider when analyzing whether punitive damages are excessive and deprive due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (2003) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Each guidepost will be considered in turn.

*Reprehensibility.* As a threshold matter, and as the jury was instructed, punitive damages may only be awarded when the defendant's conduct is sufficiently reprehensible. *See Kidis*, 973 F.3d at 715 ("That a defendant engaged in tortious or other wrongful conduct is . . . not enough, standing alone, to justify a punitive damages award.") *accord* ECF No. 162 at PageID.3876. "[I]n assessing repressibility, [courts] consider whether:" (1) "the harm was physical rather than purely economic," (2) "the tortious conduct evidenced an 'indifference to or a reckless disregard of the health or safety of others,'" (3) "'the conduct involved repeated actions or was an isolated incident,'" and (4) "the harm resulted from 'intentional malice, trickery, or deceit, or mere accident.'" *Kidis*, 9973 F.3d at 716 (quoting *State Farm*, 538 U.S. at 419). When "few, if any, of the[se] indicia of reprehensibility are present, the defendant's conduct is not considered sufficiently 'reprehensible'" to support *any* punitive damages. *Id.* at 715.

Here, *if* Plaintiff proved at trial that some ACH employee was deliberately indifferent to his medical needs—he did not—many indicia of reprehensibility exist. Plaintiff's harm was physical, the wrongful conduct—by definition—involved deliberate indifference to Plaintiff's health and safety, and the conduct could be considered as part of ACH's repeated custom of failing to adequately respond to inmate healthcare concerns. *See Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 1000 (6th Cir.2007) (noting propriety of punitive damages when the defendant engages in "similar reprehensible conduct . . . against various different parties rather than reprehensible acts within the single transaction with the plaintiff."). And even then, nothing suggests Plaintiff's injury was attributable to ACH's intentional malice, trickery, or deceit. But, as explained, Plaintiff did not provide any evidentiary basis for the jury to conclude that any *ACH employee* engaged in unconstitutional conduct—let alone *reprehensible* unconstitutional conduct. *See supra* Part III.

- 31 -

*Ratio.* The second punitive damages guidepost is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award or, in simpler terms, the ratio of punitive to compensatory damages. This guidepost is somewhat of a moving target. In cases involving less compensatory damages or exceedingly reprehensible conduct, a higher ratio is more likely constitutionally permissible.[19] *Kidis*, 976 F.3d at 715–16 (citing *State Farm*, 538 U.S. at 425). "[Y]et, even then, a nine-to-one ratio between punitive and compensatory damages is likely the outer limit that due process will permit." *Id.*; *see also State Farm*, 538 U.S. at 425 (noting an "award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety" and "in practice, few awards exceeding a single-digit ratio . . . will satisfy due process).

The 10:1 ratio here exceeds that outer limit. *See* ECF No. 165 at PageID.3911–13. Indeed, Plaintiff's $70,000 compensatory award is "not nominal," so a higher ratio is less likely permissible. *See Arnold v. Wilder*, 657 F.3d 353 (6th Cir. 2011) (finding $54,700 compensatory award in § 1983 action required a "single digit[]" ratio between compensatory and punitive damages). And, as explained above, the 10:1 ratio cannot otherwise be justified by a showing that ACH engaged in "exceedingly reprehensible conduct." *Kidis*, 976 F.3d at 717 (noting "high ratios . . . are reserved for cases with exceedingly reprehensible conduct").

*Arnold v. Wilder*, 657 F.3d 353 (6th Cir. 2011) provides a helpful comparison. There, the Sixth Circuit found the officer-defendant engaged in "exceedingly reprehensible" conduct by knocking a single mother to the ground, placing her in a chokehold, dragging her body across the

---

[19] Notably, unlike here, in § 1983 cases wholly "unaccompanied by notable physical or economic harm," the punitive-compensatory ratio is less relevant because any punitive damages award would seem excessive compared to nominal compensatory awards. *Kidis*, 976 F.3d at 715–716 (collecting cases).

street to his police car, and pepper spraying her once inside the car. *Id.* Yet, the Sixth Circuit still reduced the punitive damages to $550,000, an award *9.58* times larger than the $57,400 compensatory damages award. *Id.* at 372 (stressing the importance of a "single digit[]" ratio). Here, the degree of reprehensibility of ACH's conduct is less but the jury's punitive damages award is more. Thus, the second "guidepost" weighs in favor of a finding that the punitive damages award was excessive.

**Case Comparison.** The final "guidepost" compares Plaintiff's punitive damages award to those in comparable cases. *Kidis*, 976 F.3d at 717. The Parties provided little comparable case law. ACH notes that, in *Campbell v. Gause*, No. 10-11371, 2019 WL 1434302 (E.D. Mich. Mar. 31, 2019), this Court upheld a $5,000 punitive damages award on a prisoner's Eighth Amendment deliberate indifference claim when prison staff withheld the plaintiff's asthma medication. ECF No. 181 at PageID.5000. But the *Campbell* plaintiff did not suffer a seizure or allege any other similarly comparable medical complications as Plaintiff, here. ACH also points to *McAdoo v. Martin*, 899 F.3d 521 (8th Cir Aug. 7, 2018). ECF No. 181 at PageID.5000. In that case, the Eighth Circuit upheld the district court's decision to award *no* punitive damages to a plaintiff when the defendants withheld narcotic pain medication. But, quite distinguishable from this case, under applicable jail policy, the *McAdoo* plaintiff was not allowed to receive narcotic medication, such that the defendant's deprivation was not reprehensible, reckless, or callous. *McAdoo*, 899 F.3d at 527.

Plaintiff's cases fare no better. Plaintiff first cites *Murphy v. Gilman*, 551 F. Supp. 2d 677 (W.D. Mich. 2008), an Eighth Amendment deliberate indifference case where the Western District of Michigan upheld a $1.25 million punitive damages award. *See* ECF No. 185 at PageID.5055–56. But the plaintiff in that case *died* because the defendants prevented him from having "fresh air

and water" throughout a five-day heat wave, even though the defendants observed the plaintiff "barking like a dog, yelling at the walls," and "drinking from the toilet" in his cell. *Murphy*, 551 F. Supp. 2d at 679, 685. Then, in one breath, Plaintiff points to *Siggers-El v. Barlow*, 433 F. Supp. 2d 811 (E.D. Mich 2006), a case where this Court affirmed a $200,000 punitive damages award. ECF No. 185 at PageID.5056. But, in the next breath, Plaintiff concedes that case "did not involve a denial of medication, [nor] a serious injury," let alone the fact that the affirmed damages award was $500,000 *less* than the one the jury awarded here. *Id.*

This Court has not identified a case sufficiently comparable to Plaintiff's that reached a jury verdict.[20] Accordingly, the third and final punitive damage "guidepost" provides little practical guidance.

On balance, the three punitive damages "guideposts" suggest the jury's $700,000 punitive damages award was improperly excessive. This, coupled with the jury reaching a verdict against the great weight of the evidence, justifies a new trial. ACH's motion seeking this relief will be conditionally granted.

## V.

Accordingly, it is **ORDERED** that Defendant Advanced Correctional Healthcare, Inc.'s Motion for Judgement as a Matter of Law, ECF No. 175, is **GRANTED.**

Further, it is **ORDERED** that Defendant Advanced Correctional Healthcare, Inc.'s Motion for a New Trial, ECF No. 180, is **CONDITIONALLY GRANTED.**

---

[20] A pending case in the Eastern District of Wisconsin seems comparable to the circumstances here. *See Cobb v. McLean*, No. 24-CV-241-PP, 2024 WL 1619358 (E.D. Wis. Apr. 15, 2024). There, the plaintiff sued officials under § 1983, alleging they violated his Eighth Amendment rights by withholding his anti-seizure epilepsy medication while he was confined for a period of "thirty days," which caused him to suffer a "severe seizure," during which he "hit his head." *Id.* at *2. But that case is far from trial and provides no benchmark to assess the propriety of the jury's punitive damages award in this case.

Further, it is **ORDERED** that the March 2024 Judgment, ECF No. 166, is **VACATED.**

Further, it is **ORDERED** that Judgment is **ENTERED** in favor of Defendant Advanced Correctional Healthcare, Inc. on Count II, Plaintiff's *Monell* claim.

Further, it is **ORDERED** that Defendant Advanced Correctional Healthcare, Inc.'s Motion to Amend or Alter the March 2024 Judgment, ECF No. 181, is **DENIED AS MOOT.**

Further, it is **ORDERED** that Plaintiff's Motion for Attorney's Fees, ECF No. 173, is **DENIED AS MOOT.**

**This is a final order and closes the above-captioned case.**

Dated: February 28, 2025             s/Thomas L. Ludington
                                     THOMAS L. LUDINGTON
                                     United States District Judge